United States Court of Appeals,

Eleventh Circuit.

No. 95-4551.

John Edward TAYLOR, Petitioner-Appellant,

v.

Harry K. SINGLETARY, Secretary, Florida Department of Corrections, Respondent-Appellee.

Sept. 26, 1997.

Appeal from the United States District Court for the Southern District of Florida. (No. 92-2689-CIV-EBD), Edward B. Davis, Judge.

Before KRAVITCH and BARKETT, Circuit Judges, and HARRIS*, Senior District Judge.

BARKETT, Circuit Judge:

John Edward Taylor appeals the district court's denial of his petition for a writ of habeas corpus. In the petition, Taylor claims that the trial court abused its discretion when it denied his request to be tried after his codefendant Jesus Ortiz. As a result of the order of trials, Ortiz refused (on Fifth Amendment grounds) to offer material and exculpatory testimony on Taylor's behalf. We agree with the district court that the trial court violated Taylor's constitutional rights by effectively depriving him of a material witness's testimony. However, the district court then asked whether the trial court's error was harmless under *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), when, given the nature of the trial court's error, no such review was necessary. *Kyles v. Whitley,* 514 U.S. 419, 434-37, 115 S.Ct. 1555, 1566-67, 131 L.Ed.2d 490 (1995). We conclude that Ortiz's testimony was sufficiently material and favorable to Taylor that its absence from the trial undermines confidence in the jury's verdict. Therefore, we reverse.

I. BACKGROUND

Taylor and his codefendant Ortiz were charged with the first degree murder of Andrew Sweet. After the trial court granted Ortiz's motion for severance, Taylor moved to be tried after Ortiz so that Ortiz could provide exculpatory testimony on Taylor's behalf. In support of his motion,

*Honorable Stanley S. Harris, Senior U.S. District Judge for the District of Columbia, sitting by designation.

Taylor submitted an affidavit written by Ortiz which stated that Ortiz would assert his Fifth Amendment privilege until after his trial, but that after his conviction or acquittal he would provide exculpatory testimony at Taylor's trial. The affidavit did not proffer the details of Ortiz's potential testimony, but it authorized his lawyer to make a detailed proffer *in camera*. The trial judge declined to hear the proffer *in camera*, assumed for the sake of argument that Ortiz would provide exculpatory evidence, and stated that Taylor's appellate rights would be protected in that regard. The trial court then denied Taylor's motion and scheduled Taylor's trial first. Just prior to trial, Taylor again moved to be tried after Ortiz. The trial court again denied the motion, and reassured Taylor that he did not need to make a proffer as to Ortiz's testimony at that time.

At Taylor's jury trial the government presented two pieces of evidence connecting Taylor to the murder. The government introduced a questionable identification which placed Taylor at the victim's apartment on the day of the murder and a statement which Taylor had made during custodial interrogation in which he said he had gone to the victim's apartment with an unidentified Cuban male, who stabbed the victim after purchasing cocaine from him.[1] No physical evidence linking Taylor to the crime was presented. In his defense, Taylor called Ortiz to the stand, but Ortiz invoked his Fifth Amendment privilege. Taylor's counsel represented to the court that if Ortiz had not invoked the privilege, Ortiz would have testified that he was at the victim's house on the day of the murder with "Mark," not with Taylor.

Taylor was convicted of first degree murder on August 5, 1983. At Ortiz's subsequent trial, Ortiz testified that on the day of the murder he went to the victim's apartment with Mark. He further testified that when he left, Mark remained at the apartment and the victim was still alive. Ortiz was acquitted. On direct appeal and in a subsequent motion to vacate the judgment and sentence in state court, Taylor argued that by denying his motion to be tried after Ortiz, the trial court abused its

---

[1] Prior to trial, the trial court held a suppression hearing on the admissibility of Taylor's statement and the identification made by the two witnesses. The trial court denied Taylor's motion to suppress. The trial court also denied Taylor's motion to suppress the in-court and out-of-court identifications, finding that any discrepancies should be dealt with during cross-examination. Taylor does not appeal these rulings.

discretion and violated his Fifth and Sixth Amendment right to present material, exculpatory testimony. Without holding an evidentiary hearing on this issue, the Florida District Court of Appeal affirmed Taylor's conviction, holding that Taylor's proffer as to Ortiz's testimony was untimely because it was made after the commencement of trial. *Taylor v. State,* 472 So.2d 814 (Fla.3d Dist.Ct.App.1985). Taylor's motion for state habeas relief on the same grounds also was denied, and that denial was affirmed on appeal. *Taylor v. State,* 509 So.2d 326 (Fla.3d Dist.Ct.App.1987).

Taylor raised the same constitutional claim in his federal petition for a writ of habeas corpus. The district court denied Taylor's petition holding that, although Taylor's constitutional right to present a material, exculpatory witness had been violated, the error was harmless because it did not have a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson,* 507 U.S. at 637-38, 113 S.Ct. at 1722.

## II. DISCUSSION

It is well-settled that it is within the trial judge's sound discretion to set the order in which codefendants will be tried. *United States v. DiBernardo,* 880 F.2d 1216, 1228 (11th Cir.1989); *Byrd v. Wainwright,* 428 F.2d 1017, 1022 (5th Cir.1970). In determining the sequence of trials, however, judicial economy must yield to a defendant's right to a fair trial, and where the sequence of trials has prejudiced a defendant's defense by infringing upon his ability to present exculpatory testimony, this court has found an abuse of discretion. *See DiBernardo,* 880 F.2d at 1228; *Byrd,* 428 F.2d at 1022. Because the sequence of trials can effectively preclude a defendant from calling a codefendant to testify on his behalf in the same way that a denial for severance can, the standards for reviewing denials of severance provide useful guidance in reviewing a denial for a particular trial order. *See Byrd,* 428 F.2d at 1021-22 (looking to severance analysis to analyze the sequence of trials); *DiBernardo,* 880 F.2d at 1229 (same); *Mack v. Peters,* 80 F.3d 230, 236-7 (7th Cir.1996) (same). In particular, the same prejudice standard for reviewing whether a trial court abused its discretion in denying a motion for severance generally applies for determining whether a trial court

3

abused its discretion in scheduling the order of trials.[2] Thus, to show an abuse of discretion in ordering the sequence of codefendants' trials, an appellant must prove that he suffered compelling prejudice. *United States v. Van Hemelryck,* 945 F.2d 1493, 1501 (11th Cir.1991) (citing *United States v. Leavitt,* 878 F.2d 1329, 1340 (11th Cir.1989)). Moreover, in determining whether to grant a defendant's motion for a particular trial sequence in the first instance, the trial court must consider: (1) whether the defendant has a bona fide need for a codefendant's testimony; (2) the substance of the testimony; (3) the exculpatory nature and effect of the testimony; and (4) the likelihood that the codefendant will testify for the defendant. *Cf. Byrd,* 428 F.2d at 1019-22 (enunciating criteria for granting a motion for severance). Because the nature, substance, and significance of the codefendant's testimony are relevant to a proper evaluation of the potential prejudice that preclusion of the testimony would have on the defendant, the defendant must make a "clear showing" as to the substance of the codefendant's testimony, and that the testimony will be exculpatory. *Id.* at 1020. However, "it is not necessary [ ] that the potential testimony of the codefendant bear the imprimatur of having been given previously in a judicial proceeding under oath," *id.;* it is enough that the defendant has made written or oral exculpatory statements in the past, or discussed the content of those statements with the court, *id.* Similarly, with respect to factor (4), "[t]he inquiry is not as to certainty whether the codefendants will or will not testify but the likelihood." *Id.* at 1022.

At the time Taylor moved to be tried first, Taylor had a bona fide need for Ortiz's testimony, the substance, nature, and effect of the testimony favored granting Taylor's motion, and it was very likely that Ortiz would have testified on Taylor's behalf. Throughout the original proceedings in this case, Taylor clearly stated his intention and desire to call Ortiz as a defense witness, and Ortiz clearly indicated his willingness, through a signed affidavit and otherwise, to provide exculpatory evidence on Taylor's behalf after the conclusion of his own trial.

---

[2]With respect to motions for severance, Fed.R.Crim.P. 14 provides: "If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."

But the trial court did not consider the substance, nature, or effect of Ortiz's proposed testimony contemporaneously with its denial of Taylor's motion to be tried after Ortiz. Although Ortiz offered to proffer the testimony *in camera,* the trial court refused to hear it. The trial court assumed for the sake of argument that Ortiz would provide exculpatory evidence and twice assured Taylor that his rights would be protected if he chose to appeal the denial. However, Taylor's trial rights were not adequately protected because Ortiz was under no compunction to give a prior sworn statement against his own interests prior to his trial, and Ortiz did in fact invoke his privilege against self-incrimination during Taylor's trial. Moreover, there was no reason even suggested, much less given, for trying Ortiz first. Thus, there was no basis whatsoever to deny Taylor the benefit of presenting his defense.

In evaluating Taylor's claims, the district court concluded that resolution of this case, and the issue of prejudice in particular, depended primarily upon the substance, nature, and effect of Ortiz's testimony, and properly held a hearing to make findings as to that testimony. Based upon those findings, the district court essentially concluded that the importance of Ortiz's testimony was such that its effective preclusion caused Taylor to suffer prejudice. We believe that the district court's ruling in that regard correctly found that the trial court abused its discretion in denying Taylor's motion to be tried after Ortiz.

After finding constitutional error in the denial of Taylor's motion to be tried after Ortiz, the district court then conducted a harmless-error review. The court ruled that the error did not warrant habeas relief because it did not have a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht,* 507 U.S. at 637-38, 113 S.Ct. at 1722. However, the district court incorrectly applied the harmless error test to this claim of a denial of the right to present a material witness and to mount a defense. The favorable testimony of Ortiz, rendered unavailable by the trial court, meets the materiality standard articulated in *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Since the constitutional standard for materiality under *Bagley* imposes a higher burden on the petitioner than the harmless-error standard of *Brecht v. Abrahamson,*

5

there is no need for further harmless-error review of the trial court's error. *Kyles v. Whitley,* 514 U.S. 419, 434-37, 115 S.Ct. 1555, 1566-67, 131 L.Ed.2d 490 (1995). Although *Kyles* was decided after the district court issued its order denying Taylor's petition for a writ of habeas corpus, *Kyles* does not announce a new constitutional rule, but simply articulates the proper interplay between the *Brecht* harmless error standard and the Fifth and Sixth Amendment materiality standard. Thus, *Kyles* 's rationale informs our analysis in this case.

It is well-established that defendants have a Fifth and Sixth Amendment right to present witnesses that are "both material and favorable" to their defense. *See United States v. Valenzuela-Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) (defendant has Sixth Amendment right to compulsory process in order to call a witness whose testimony is "both material and favorable to the defense"); *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (accused has fundamental right to present witnesses in his own defense and that right is essential to due process); *Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (Sixth Amendment right to present witnesses in one's own defense applies to state proceedings through the due process clause of the Fourteenth Amendment). Moreover, trial court decisions can infringe upon a defendant's Fifth and Sixth Amendment trial rights. *See, e.g., Pennsylvania v. Ritchie,* 480 U.S. 39, 57-58, 107 S.Ct. 989, 1000-01, 94 L.Ed.2d 40 (1987) (trial court's decision to deny access to files to the defendant implicates Confrontation and Compulsory Process Clauses); *United States v. Elliott,* 571 F.2d 880, 908 (5th Cir.1978) ("while the scope of cross-examination is within the discretion of the trial judge, this discretionary authority to limit cross-examination comes into play only after there has been permitted as a matter of right sufficient cross-examination to satisfy the Sixth Amendment").

In *Valenzuela-Bernal,* 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), the Court imported the materiality requirement from the line of cases beginning with *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), into compulsory process clause analysis. *Valenzuela-Bernal,* 458 U.S. at 872-74, 102 S.Ct. at 3449-50; *see also Ritchie*, 480 U.S. at 56-58,

6

107 S.Ct. at 1000-1. Following this line of cases, the Court concluded that evidence is material "only if there is a reasonable likelihood that the testimony could have affected the judgement of the trier of fact." *Valenzuela-Bernal*, 458 U.S. at 874, 102 S.Ct. at 3450. In *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), the Court adopted a "reasonable probability" test of materiality, defining it as "a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383. To meet the "reasonable probability" standard, the defendant does not need to demonstrate that, after discounting the inculpatory evidence in light of the evidence in question, there would not have been enough evidence to convict him. *Kyles v. Whitley,* 514 U.S. 419, 434-35, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). He need only show that the "evidence [unavailable at trial] could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* Taylor has met this burden.

In his opening statement to the jury, the prosecutor read the grand jury indictment in the case which stated that Taylor and Ortiz together murdered Andrew Sweet. The prosecutor then added: "It is my burden of proof to convince you beyond a reasonable doubt that we proved up that indictment." (R32-7). In support of its case, the state offered the testimony of two witnesses which placed Taylor at Sweet's apartment on the day of the murder and self-incriminating statements by Taylor to the police. Ortiz's testimony, had it been offered, could have substantially impacted the judgment of the jury with respect to both the identification testimony and the inculpatory statements.

The state first presented the testimony of Ratner and Orenstein, two security alarm installers who identified Taylor as one of the men who arrived at Andrew Sweet's apartment on the day of his murder. On October 16, they installed an alarm in Sweet's apartment. At about 4:30 p.m., as they prepared to leave, two men, a white man and a Latino, knocked on Sweet's door. In exiting the apartment, Ratner and Orenstein walked directly by the white man, whom they described as five feet ten inches to six feet tall. They also testified that the Latino man was leaning against the wall, holding a brown paper bag. Ratner and Orenstein were not able to identify Taylor during the first photographic line-up in which they participated. However, they did identify him during a second

7

photographic line-up and in court. On cross-examination, the defense elicited that Taylor was six feet four inches tall (four to six inches taller than Ratner and Orenstein described), and that there was a discrepancy between the clothing worn by the white man and the bloody clothing left at the crime scene (and allegedly worn by the murderer). The witnesses also acknowledged that they made their first positive identification of Taylor after his picture appeared in the newspaper.

The state also presented Taylor's statement in which he stated he went to Andrew Sweet's apartment on October 16 with an otherwise unidentified Cuban man "at night time." Taylor stated that they did not run into anyone in the apartment building's hallway as they entered Sweet's apartment. According to Taylor, after buying twenty dollars worth of cocaine from Sweet, Taylor started walking towards the door to leave, and while they were still in the living room, the Cuban man stabbed Sweet in the stomach. Taylor further stated that he and the Cuban man moved Sweet to the bedroom and laid him down in or near the closet, where the Cuban man continued to stab him in the chest. Before leaving the apartment, Taylor changed into Sweet's clothes and left behind the bloody surfing shirt and jeans he had been wearing. Taylor also stated that he took a couple of rocks of cocaine and a bag of cocaine from Sweet's apartment and put them in his jacket pocket. Upon cross-examination of the detective who took Taylor's statement, the defense elicited a number of inconsistencies between Taylor's statement and the physical evidence at the crime scene, including that most, but not all, of Sweet's wounds were on his neck, shoulders and face; blood was found only in the bedroom, and not in the living room; there was no evidence of either cocaine or blood on the jacket Taylor had been wearing; and, at the time he made his statement, Taylor did not mention that Sweet had been stabbed with a screwdriver or tied up with an electrical cord. (Indeed, in his statement, Taylor maintained that the killer used a large butcher knife to stab Sweet.)

Had Ortiz testified, presumably his testimony would have correlated with that offered at his own trial. At that trial, Ortiz testified that, on the day of the murder, he went with someone named Mark to Andrew Sweet's apartment because Sweet owed Mark money. Ortiz stated that he was holding a beer in a brown paper bag, and that the security alarm installers were leaving as he and

8

Mark arrived. According to Ortiz, he waited in Sweet's living room while Mark and Sweet were in the bedroom, but eventually left without Mark because he wanted to make it to Fort Lauderdale by 6:30 p.m.

Ortiz's testimony certainly would have called into question the witnesses' identification of Taylor. Ratner's and Orenstein's version of events correlates almost exactly with Ortiz's hallway encounter with the security alarm installers. Taylor, on the other hand, stated that he did not see anyone in the hallway. Coupled with the discrepancies between Ratner's and Orenstein's description of the white man and Taylor's physical characteristics, and their failure to identify Taylor in the first photo line-up, Ortiz's testimony would have substantially reduced or destroyed the value of those witnesses.

With respect to Taylor's inculpatory statement, defense counsel claims that, because Ortiz did not testify, counsel made strategic decisions that severely impaired its ability to impeach Taylor's statement. Ortiz's credible testimony, by underscoring the discrepancies between Taylor's version of events and the physical evidence in the case, would have offered the jury some basis (beyond Taylor's recanting of his statement) for discounting Taylor's statement. Defense counsel would have then presented or highlighted other factors tending to weaken the credibility of the statement: 1) the police questioned Taylor seven times over the course of ten days; he denied any involvement in the crime until the seventh interrogation; 2) only one officer was present, and no tape recording was made, when Taylor first admitted that he was present during the murder. (After their conversation, Taylor gave a statement that was recorded and witnessed by another officer.); 3) at various points in their conversations with Taylor, the police offered factual details to Taylor concerning the physical circumstances of the murder. Without Ortiz's testimony, defense counsel determined that their best strategy was to forego presenting its weak defense in lieu of preserving counsel's right to argue first and last to the jury pursuant to Fla.R.Crim.P. 3.250. In short, Taylor's inability to call Ortiz essentially precluded him from putting on a defense.

9

After a thorough review of the record, we are not confident that the jury's verdict would have been the same if Ortiz had testified.  In other words, in the absence of Ortiz's testimony, Taylor did not receive "a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566.  Accordingly, we reverse and remand for a new trial.

REVERSED and REMANDED.

HARRIS, Senior District Judge: I respectfully dissent.