[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-15201

_____

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
March 18, 2005
THOMAS K. KAHN
CLERK**

D. C. Docket No. 96-00400-CV-SH

THEODORE J. DE LISI,

Petitioner-Appellee,

versus

JAMES V. CROSBY, Secretary,
Florida Department of Corrections,

Respondent-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(March 18, 2005)**

Before ANDERSON, PRYOR and HILL, Circuit Judges.

PRYOR, Circuit Judge:

The issue in this appeal is whether the district court erred when it granted a

writ of habeas corpus on the ground that the state trial court violated Theodore De Lisi's rights, under the Confrontation and Compulsory Process Clauses of the Sixth Amendment, by refusing to permit De Lisi to cross-examine James White, the star witness for the government, about White's bank records and tax returns and by quashing a subpoena for White's tax returns. The primary defense strategy was to attack White's credibility on several grounds, including his unexplained, substantial, and potentially illegal income. To that end, De Lisi elicited abundant evidence that White was a career criminal who lived a suspiciously lavish lifestyle and had received lenient treatment by the government. The jury even heard White invoke his privilege against self-incrimination in response to a question about tax fraud, and in his closing argument DeLisi's counsel reminded the jury about that event. Because any error in limiting the cross-examination of White about the tax returns and bank records was harmless and quashing the subpoena was not material, we reverse the grant of habeas relief by the district court.

## I. BACKGROUND

To explain the context of this appeal, we will review three matters. The first matter is the events leading to the criminal charges against De Lisi. We will then review the proceedings in the state courts. Finally, we will review the habeas proceedings in the district court from which this appeal was taken.

2

*A. The Events Leading to the Criminal Charges*

James White, a convicted felon, worked as a confidential informant for the Florida Department of Law Enforcement (FDLE).  On June 17, 1988, White met with De Lisi and his brother, Richard, to discuss importing marijuana from Colombia for later distribution in New York by Richard.  At that meeting, De Lisi stated that "he didn't want to do it or ... be involved in it."  White met with Richard and De Lisi again on July 7, 1988, at the automobile paint and body shop owned by the De Lisi family, to discuss importing marijuana, but De Lisi did not participate in that part of the conversation.

On July 19, 1988, the FDLE arranged a meeting between Richard and White at the Pompano Air Center.  The agent who monitored the meeting visually and with electronic audio surveillance testified that two persons, neither of whom the agent could identify as De Lisi, picked up White and drove away.  After losing electronic contact with and sight of the car, the agent went to the De Lisis' automotive shop.  The agent did not see the car or White at the automotive shop, waited for approximately one minute, and returned to the Air Center, where he found White waiting.  The agent testified that, based on his observations and a debriefing of White, the agent did not believe that White went to the automotive shop that day.

White testified that he was picked up at the Air Center by Richard, and that De Lisi was not in the car. White further testified that Richard drove him to the shop, where De Lisi was waiting and gave White a map of Colombia to show White where to pick up the marijuana. It is undisputed that the map White gave the agent had De Lisi's fingerprints on it.

### B. The Proceedings in the State Courts

In late 1988, De Lisi was charged by the State of Florida with trafficking in excess of 100 pounds of marijuana, conspiracy to traffic in excess of 100 pounds of marijuana, and a violation of the Florida Racketeering Influenced and Corrupt Organizations Act (RICO). Richard and an associate, Terry Johnson, were also charged with those crimes. After the state was unable to locate Johnson, a joint trial was scheduled for the De Lisi brothers.

On August 31, 1989, more than four months after the deadline for the completion of discovery, the prosecution received a discovery response with 390 pages of defense exhibits that consisted primarily of White's personal bank records. Also after the deadline, De Lisi served a subpoena for the income tax returns of both White and his wife, Shelley. After a pre-trial hearing on September 20, 1989, the court found that these untimely filings by De Lisi violated both Florida discovery rules and the pretrial order, and the court granted motions by the

4

state to exclude the bank records and quash the subpoena for the Whites' tax returns. The court also based its order in part on erroneous information about the bank records and Shelley White's status as a witness, which the court received in an ex parte communication with the prosecution.

At trial, De Lisi's defense strategy was to destroy White's credibility on several fronts, because White's testimony was the linchpin of the case for the government. De Lisi argued that White's testimony was unreliable because White was a career criminal still engaged in suspicious activities and White had possibly given false testimony in another proceeding. De Lisi argued that because White had received lenient treatment from the government and was at risk of further prosecution and forfeiture of assets, White had an incentive to give false testimony favorable to the government. De Lisi also contended that White had brain damage from an accident and drug use, and White's alleged mental impairment made his testimony unreliable.

During his cross-examination of White, De Lisi elicited several admissions to support De Lisi's argument that White lacked credibility and had reason to be biased in favor of the prosecution. White admitted that he had been released from jail when he began working as an informant, and his sentence was reduced from five years to four months. White admitted that he no longer faced statewide

5

indictment when he agreed to work as an informant. White conceded that he had been acquitted for a cocaine charge on a technicality, he used cocaine while working as an informant, and he smuggled marijuana on at least thirty occasions for which he was not prosecuted. White understood that his assets were subject to forfeiture if he was convicted of drug smuggling, and White admitted that he had taken precautions against forfeiture by forming an off-shore corporation in the Cayman Islands.

De Lisi also attempted to prove, during his cross-examination of White, that White was still involved in illegal activities and perhaps had given false testimony in an earlier trial. De Lisi established that, although White had testified at a trial five years earlier to owning only $20,000 in liquid assets, and since then had an annual income of about $50,000, White lived a lavish lifestyle inconsistent with a middle-class income. White had spent at least $45,000 at East Coast Avionics during the three years before trial, and spent approximately $5,000 per year to maintain his guard dogs. White conceded that he owned a $500,000 ranch, a $240,000 plane, a $223,000 motor home, a $43,000 Jaguar, a $15,000 diamond-studded Rolex watch that he wore at trial, and a 5.25 carat diamond pinky ring that he also wore at trial. For emphasis, De Lisi required White to write the value of each asset on a board that rested on an easel near the jury. The total value of those

6

assets exceeded one million dollars.

The only limitation placed on De Lisi's strategy to discredit White pertained to the bank records and tax returns, but De Lisi still scored points regarding both White's bank records and taxes. On cross-examination, White admitted that one reason he created his corporation in the Cayman Islands was to avoid paying taxes on illegal income. After De Lisi asked whether White had filed false tax returns, the trial court informed White that he could choose not to answer if, by answering, he might incriminate himself. White then invoked, in the presence of the jury, his right not to incriminate himself. De Lisi argued in closing that White's invocation of the privilege regarding possible tax fraud evidenced that his testimony was incredible. De Lisi also argued in closing that White had more bank accounts than the president of each bank where White's funds were deposited.

De Lisi's strategy failed. De Lisi was convicted on all three charges and sentenced to thirty-year consecutive sentences on each charge. On August 7, 1991, the Florida Second District Court of Appeals affirmed on direct appeal De Lisi's RICO and trafficking convictions, but overturned the conviction for conspiracy. DeLisi v. State, 585 So. 2d 963 (Fla. 2d Dist. Ct. App. 1991). The court held that, although De Lisi's fingerprints on the map, combined with White's testimony that De Lisi gave him the map, supported the RICO and trafficking convictions, the

fingerprints did not support a conviction for conspiracy. Id. at 964-65.

*C. Federal Habeas Proceedings*

On February 20, 1996, De Lisi filed a federal habeas petition that stated two grounds for relief: (1) the trial court violated De Lisi's rights under the Confrontation Clause of the Sixth Amendment by excluding evidence of the Whites' bank statements and prohibiting De Lisi from cross-examining White about White's tax returns, and (2) the trial court violated De Lisi's rights under the Compulsory Process Clause of the Sixth Amendment by quashing the subpoenas for the Whites' tax returns. The district court denied De Lisi's petition for lack of exhaustion, and De Lisi appealed. The state conceded on appeal that the district court erred, but argued that the petition should be dismissed because De Lisi was in procedural default. This Court reversed and remanded for the district court to address the issue of procedural default. On remand, the district court found that the claims were procedurally barred.

De Lisi appealed again. This Court reversed and held that De Lisi's confrontation and compulsory process claims were not procedurally barred because the state appellate court did not declare that its judgment rested on a state procedural bar. On remand, the magistrate judge held an evidentiary hearing regarding both White's bank statements and the error of the trial court in stating

8

that Shelley White was not a witness in the order excluding the bank statements.

At the evidentiary hearing, De Lisi revised his argument about the bank records and admitted that the records showed far less questionable income than he had contended before the trial. At the pre-trial hearing, De Lisi asserted that the bank statements proved that White deposited between four million and fifteen million dollars in the bank accounts. At the evidentiary hearing ten years later, De Lisi conceded that his earlier calculation was erroneous because he had misread internal bank tracking numbers on the statements as the amount of the assets in those accounts. At the evidentiary hearing, De Lisi admitted that the bank records evidenced that White had deposited, at most, $750,000 into the account between 1984 and 1988. De Lisi's financial expert also admitted, at the evidentiary hearing, that the $750,000 might include a significant amount of double counting, and the expert needed other documents he did not possess to arrive at an accurate estimation. De Lisi's financial expert also conceded that White's net worth may have increased from 1982 to 1989 by as little as $63,000, consistent with White's testimony at trial.

After the evidentiary hearing, the magistrate judge recommended that De Lisi's habeas petition be granted. The district court adopted the magistrate judge's report and recommendation and granted De Lisi's habeas petition. The state filed a

motion for stay, which the district court denied on October 12, 2004.  The state immediately filed a notice of appeal and an emergency motion for stay.  We entered a temporary stay, and upon letter briefs from both parties, stayed the order of the district court pending appeal.

## II.  STANDARD OF REVIEW

Because this habeas petition was filed before April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act, that Act does not apply. Thompson v. Haley, 255 F.3d 1292, 1295 (11th Cir. 2001).  We apply separate standards for reviewing the determinations of the state courts and the district court. We presume the factual findings of the state court are correct if reasonably based on the record, and we review the conclusions of law of the state court de novo.  Id. We review the findings of fact of the district court for clear error, and the legal conclusions of the district court de novo.  Id.  A determination of the harm caused by erroneous evidentiary decisions in a criminal case is a conclusion of law.  Lacy v. Gardino, 791 F.2d 980, 986 (1st Cir. 1986).

## III.  DISCUSSION

Florida makes two arguments on appeal.  First, Florida argues that the trial court did not violate De Lisi's rights, under the Confrontation Clause of the Sixth Amendment, when the court refused to allow De Lisi to use White's bank records

10

to cross-examine White, and any violation of the Confrontation Clause was harmless when the court permitted White to assert his Fifth Amendment privilege in response to questions about filing false income tax returns. Second, Florida argues that the trial court did not violate De Lisi's rights, under the Compulsory Process Clause of the Sixth Amendment, when the court quashed De Lisi's subpoena for White's income tax returns, because the excluded tax returns were not material. We consider each argument in turn.

### A. The Trial Court Did Not Violate De Lisi's Confrontation Rights.

A limitation on cross-examination can violate the Sixth Amendment right to confrontation if it prevents the defendant from showing that a witness is biased:

> [A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness."

Delaware v. Van Arsdall, 475 U.S. 673, 680, 106 S. Ct. 1431, 1436 (1986). The discretion of a trial judge to limit cross-examination is more narrowly circumscribed when the witness is vital to the case presented by the government: "where the witness sought to be cross-examined is the government's 'star' witness, providing an essential link in the prosecution's case, the importance of full cross-examination to disclose possible bias is necessarily increased." United States

11

v. Lankford, 955 F.2d 1545, 1548 (11th Cir. 1992).

Not every limitation on cross-examination violates the Confrontation Clause. "[T]he Sixth Amendment does not require unlimited inquiry into the potential bias of a witness. As long as sufficient information is elicited from the witness from which the jury can adequately assess possible motive or bias, the Sixth Amendment is satisfied." Id. at 1549 n.10 (internal citations and quotations marks omitted).

Florida contends that the district court erred when it found that the trial court violated De Lisi's right to cross-examine White, because any error of the trial court was harmless. The district court concluded that the trial court violated De Lisi's rights both by permitting White to invoke his right not to incriminate himself and by preventing De Lisi from cross-examining White about his bank records. We first consider the decision of the trial court to permit White to invoke his right not to incriminate himself, and then consider the decision of the trial court to exclude White's bank records.

1. White's Invocation of His Fifth Amendment Privilege was Harmless Error.

Florida argues that if the trial court erred by permitting White to invoke his right not to incriminate himself, any error was harmless. We agree. Although the trial court erred by allowing White to invoke his privilege after White's previous

waiver of that privilege, that error was harmless because De Lisi elicited substantial evidence to allow the jury to assess White's credibility.

The trial court erred by permitting White to assert his Fifth Amendment privilege to refrain from responding to De Lisi's question about whether White had committed tax fraud. In a pre-trial deposition, White waived the privilege when he answered the same question. "A witness who testifies at any proceeding, instead of asserting his Fifth Amendment rights, loses the privilege." United States v. White, 846 F.2d 678, 690 (11th Cir. 1988).

Although the trial court erred by permitting White to assert his Fifth Amendment privilege, that error entitles De Lisi to habeas relief only if the error was not harmless. Chapman v. California, 386 U.S. 18, 22, 87 S. Ct. 824, 827 (1967). Error is constitutionally harmful if "the error had substantial and injurious effect or influence in determining the jury's verdict." California v. Roy, 519 U.S. 2, 5, 117 S. Ct. 337, 338 (1996). Because the erroneous exclusion of evidence occurred "during the presentation of the case to the jury, [the error can be] quantitatively assessed in the context of other evidence presented in order to determine the effect it had on the trial." Brecht v. Abrahamson, 507 U.S. 619, 629, 113 S. Ct. 1710, 1717 (1993) (internal citations and quotation marks omitted).

Although this trial error is subject to harmless error review, trial errors are

13

subject, on habeas review, to an even less exacting standard than that employed on direct review. "[W]here a judge, in a habeas proceeding, applying this standard of harmless error, is in grave doubt as to the harmlessness of an error, the habeas petitioner must win." Roy, 519 U.S. at 5, 117 S. Ct. at 338. Grave doubt means that, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." O'Neal v. McAninch, 513 U.S. 432, 435, 115 S. Ct. 992, 994 (1995). We do not find ourselves in equipoise.

The Supreme Court has explained that we must holistically evaluate the cross-examination of the witness and determine whether an error in limiting cross-examination was harmless:

> Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

Van Arsdall, 475 U.S. at 684, 106 S. Ct. at 1438. Although White's testimony was vital to the prosecution, was not cumulative, and lacked substantial corroboration, the limitation on De Lisi's cross-examination of White was insubstantial.

De Lisi conducted a searching cross-examination of White in which De Lisi elicited copious evidence to impeach White. When White invoked his right against

14

self-incrimination in the presence of the jury in response to a question about tax fraud, that invocation actually benefitted De Lisi, as he reiterated in his closing argument.  Because the addition of the tax returns to this already ample evidence would not have substantially changed the jury's view of White's bias or credibility, the error of the trial court in permitting White to assert his Fifth Amendment privilege cannot be said to have "had substantial and injurious effect or influence in determining the jury's verdict."  Roy, 519 U.S. at 5, 117 S. Ct. at 338.

 2.  The Trial Court Did Not Violate the Confrontation Clause by Precluding Cross-Examination About White's Bank Records.

Florida next argues that the district court erred when it found that the trial court violated De Lisi's rights by preventing him from cross-examining White about White's bank records.  De Lisi intended to question White about his bank records to show that White had more assets than he could legitimately explain. The trial court did not violate De Lisi's rights, because De Lisi showed, even without the bank records, that White had suspiciously extensive assets.

If anything, the exclusion of the bank records saved De Lisi from a potential embarrassment.  Before the trial, De Lisi asserted that the bank records evidenced that White deposited between four million and fifteen million dollars, but ten years later, De Lisi revised his estimate drastically downward.  If the trial court had permitted De Lisi to use the bank records, the government would have been able to

15

expose De Lisi's earlier miscalculations and even bolster White's damaged credibility.

There is a stark contrast between the minor limitation of De Lisi's cross-examination of White and the categorical limitations condemned by this Court and the Supreme Court in other cases. In Lankford, the trial judge did not permit any evidence that the children of the star witness of the government were subject to pending government prosecution that might be dropped if the witness testified favorably. 955 F.2d at 1548. In United States v. Baptista-Rodriguez, the trial court excluded all the evidence necessary for several credibility challenges against the star witness of the government. 17 F.3d 1354, 1366-67 (11th Cir. 1994). In Van Arsdall, the trial court "prohibited all inquiry into the possibility that [the star witness of the government] would be biased as a result of the State's dismissal of his pending public drunkenness charge." 475 U.S. at 679, 106 S. Ct. at 1435 (emphasis added). In contrast, the trial court allowed De Lisi to conduct a broad inquiry and elicit damaging admissions from White. Because the jury was allowed to assess White's credibility and possible motives for bias, "the Sixth Amendment [was] satisfied." Lankford, 955 F.2d at 1549 n.10.

B.  *De Lisi Failed to Prove His Right to Compulsory Process Was Violated.*

Florida argues that the trial court did not violate De Lisi's right to

16

compulsory process, under the Sixth Amendment, when the court quashed De Lisi's subpoenas for White's tax returns. We again agree. Because the tax returns were not material under the deferential standard we employ on habeas review, the trial court did not violate De Lisi's rights when it quashed his subpoena.

To establish that the trial court violated his right to compulsory process, De Lisi had to prove that the excluded tax returns were material. Taylor v. Singletary, 122 F.3d 1390, 1395 (11th Cir. 1997). De Lisi had to "show that the evidence unavailable at trial could [have] reasonably be[en] taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. This standard is more rigorous than the harmless error standard: "the constitutional standard for materiality ... imposes a higher burden on the petitioner than the harmless-error standard of Brecht ...." Taylor, 122 F.3d at 1394; see also Kyles v. Whitley, 514 U.S. 419, 435-36, 115 S. Ct. 1555, 1566-67 (1995).

We have already concluded that the limitations on cross-examination regarding White's tax returns and bank records were, at most, harmless error, and De Lisi does not argue that the subpoenaed tax returns would have proved anything different from the precluded cross-examination. Because De Lisi failed to establish harmless error, he necessarily cannot meet the more rigorous standard of materiality. De Lisi was not entitled to habeas relief.

17

## IV. CONCLUSION

After De Lisi's fierce assault on White's credibility, the jury believed White and convicted De Lisi with eyes wide open. The minor limitation of De Lisi's cross-examination of White either did not violate De Lisi's constitutional rights or was harmless error. The grant of habeas corpus by the district court is

**REVERSED.**