[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-17788

_____

D.C. Docket No. 2:16-cr-00098-AKK-TMP-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DONALD E. STEELE,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(April 17, 2019)

Before ROSENBAUM, BRANCH and DUBINA, Circuit Judges.

PER CURIAM:

Following a trial, the jury convicted Donald Steele of five counts of assisting

in the preparation and presentation of fraudulent tax returns, in violation of 26 U.S.C

§ 7206(2), and one count of witness tampering, in violation of 18 U.S.C. § 1512(b)(3). Steele contends that the district court erred by not permitting him to call Internal Revenue Service ("IRS") Agent David Tucker to impeach the testimony given by one of Tucker's colleagues, Daphne Stewart, who had testified that Steele had the opportunity to commit tax fraud. After careful consideration and with the benefit of oral argument, we affirm.

## I.

In a nutshell, the government's case had two parts. The first part centered on proving that Steele had prepared seven fraudulent tax returns while working at Max Tax[1] by taking fake deductions, such as listing one customer's wife as his disabled dependent sister. In the other part of the government's case, the government sought to show that once the IRS was hot on his heels, Steele attempted to coax witnesses— principally the customers whom he had filed the fraudulent returns on behalf of— into stonewalling the IRS or shifting blame onto others, including his wife. Steele's defense focused on exploiting the fact that he was not listed as the preparer on any of the fraudulent tax returns and on his contention that he lacked the technical know-how to file fraudulent returns since he mainly was responsible for greeting customers.

---

[1] Max Tax was owned by Steele's wife, Chaundra Jones, along with Renda Wilson.

At trial, the government presented testimony from three types of witnesses: (1) customers of Max Tax who testified that they had turned over their financial information to Steele and that he had told them their returns had been filed (some of these witnesses also testified that Steele later tried to persuade them to tell the IRS that somebody else had prepared their taxes); (2) a 2011 Max Tax employee named Daphne Stewart, and (3) investigating agents from the IRS.

The jury returned a guilty verdict on Counts 3 through 7 (assisting in the preparation and presentation of fraudulent tax returns) and Count 9 (witness tampering).  With respect to Counts 3 through 7, the government presented the following evidence supporting the jury's verdict.  Counts 3 and 4 arose from Alisa Tate's 2009 and 2010 tax returns, which improperly claimed $12,049 and $11,938 in business losses, respectively.  Tate testified that she gave her 2009 and 2010 financials to Steele and did not interact with any other Max Tax employee.  Both of these returns claimed deductions to which she was not entitled—for example, a deduction for expenses and losses from a non-existent home-furnishings business. Tate testified this information was false and she had no idea where Steele got it from.

On cross-examination, Tate stated that although she did not physically watch Steele prepare her tax returns, she assumed he prepared her returns since he was the only person she spoke with at Max Tax.  Her returns listed Michael Eaton and Jones as the preparers, but she testified that she had never met them before.

3

Counts 5 and 6 arose from Jeannet Washington's 2009 and 2010 tax returns. Washington testified that she gave her financial information to Steele and waited at Max Tax while her taxes were prepared both years. In fact, according to Washington, she picked Max Tax solely because Steele worked there, as she knew his work from another tax-preparation service. Washington testified that for both tax returns, Steele told her that he had finished her returns and showed her the amount she could expect in the form of a refund. But she testified that Steele never went over the returns line by line with her.

Washington identified the items that were falsified on those lines on her two returns. She testified that both of her returns listed improper medical and dental expenses, charitable contributions, and educational expenses for her son, and also incorrectly listed her as the head of household. While Washington's returns identified Renda Wilson and Chaundra Jones as the preparers, Washington stated she never worked with them.

As for the last two counts for which the jury convicted Steele—Counts 7 and 9—the government's case centered on Katrina Taylor. For Count 7, the government contended that Steele had falsified a tax return without telling her, just like it asserted he did to Tate and Washington. In support of this allegation, Taylor testified that, based on her cousin's referral, she went to Max Tax to have her 2010 tax returns prepared. She said she waited while Steele prepared her tax return, and he called her

back to sign it after he had completed it.   Taylor's return included improper deductions for expenses relating to education, and it listed the wrong place of employment.  Taylor testified that Chaundra Jones was identified as the preparer of her return, but she had never met her.  And though Taylor repeatedly tried to obtain a copy of her tax return, Steele stymied her at every turn by ignoring her calls or pretending he could not find it.

For Count 9—Steele's lone witness tampering conviction—Taylor testified that, out of the blue, Steele approached her outside of her job in August 2011.  She attested that Steele said Taylor's cousin had told him that he had charged Taylor too much for preparing her taxes and that the IRS had inquired about her returns.  Steele then cut Taylor a check for $200, stating that the check was for any overcharging, but if the IRS ever asked, she should tell them that "a lady with red hair" had prepared her taxes.  Taylor understood Steele's actions as asking her to lie to the IRS, complete with an accompanying $200 bribe.

As fate would have it, Taylor soon thereafter met with agents from the IRS, including Agent Tucker.  According to Taylor, Steele hounded her during her meeting by calling her multiple times.  Taylor answered one of Steele's calls during the meeting and put it on speaker phone.  Steele then said, "Are they still there?"  When Taylor replied in the affirmative, Steele hung up.

Apart from Steele's clients, the government called Daphne Stewart, one of Steele's co-workers.[2]  It is this testimony and Steele's efforts to impeach it that comprise the backbone of Steele's appeal.

Stewart testified that she prepared tax returns for three months in 2010 alongside Steele at Max Tax.  According to Stewart, she usually arrived at work around 9:00 a.m. or 10:00 a.m. and left around 3:00 p.m. or 4:00 p.m., and Steele was always there when she arrived and when she left.  Stewart also stated that when she arrived at work in the mornings, Steele would often tell her that the returns they had been working on the previous day had been transmitted to the IRS.  As Stewart recalled the work environment, no other employee reviewed Stewart's and Steele's work before the returns were submitted to the government.

One time, after Stewart had completed her mother's return, Steele told Stewart that before he submitted the return to the IRS, he added a disabled dependent who had thousands in educational expenses "so she could get more money."  For adding these additional deductions, Stewart attested, Steele told her that her mother owed him $500.  Stewart admitted that she also increased her customers' tax refunds by a few hundred dollars.

---

[2] For the third category of witnesses—IRS agents—the government called Agent Jason Torain, who testified that he had examined the tax returns at issue and listened to the testimony of the witnesses.  Torain testified that the changes made to Tate's, Washington's, and Taylor's tax returns were "fluffing" practices designed to substantially inflate tax refunds.

Eventually, Stewart quit her job at Max Tax because the company shorted a few of her paychecks and because she heard the IRS was investigating inflated returns that had been prepared at Max Tax. In the month of October following her resignation from Max Tax, Stewart met with Steele at a restaurant, where Steele asked Stewart to rejoin Max Tax, while also inquiring whether the IRS had contacted her. Stewart testified Steele told her that if the IRS happened to call, then she should tell agents that Steele's wife, Chaundra Jones, did "all of the work" and transmitted all of the returns.

On cross-examination, defense counsel asked Stewart if she had previously told the IRS that she worked from 8:00 a.m. to 8:00 p.m., and Stewart responded that, if the IRS agents had recorded her as saying this, then they had misheard her. When counsel questioned her about whether she had told the IRS agents that Wilson or Jones reviewed Steele's and her work before the tax returns were transmitted, Stewart testified that she never told them that, either.

As it turns out, Agent Tucker had prepared a memorandum after interviewing Stewart, and this memorandum apparently reflected that Stewart had, in fact, made the statements in controversy. The government objected when counsel asked questions based on IRS Agent Tucker's memorandum of his interview with Stewart because the memorandum was not in evidence. But the court overruled the government's objection, and counsel continued his references to Agent Tucker's

memorandum.  For instance, after counsel forced Stewart to admit she had filed false tax returns for herself and her customers, counsel pointed out that she had told Agent Tucker that she knew her tax returns were inaccurate, but did it, anyway, because she needed the extra money.

After the government rested, Steele announced his intentions to call Agent Tucker, so he could impeach Stewart's testimony that Steele worked longer hours than she did and that their work was not subject to supervisory review, using contrary statements Stewart had given to Agent Tucker.  The government objected on two bases:  (1) it asserted Steele forfeited his right to call Agent Tucker because had not complied with the IRS's *United States ex rel. Touhy v. Ragen*, 71 S. Ct. 416 (1951), regulations; and (2) it contended the testimony Agent Tucker would give about what Stewart had told him was inadmissible because it was too collateral and constituted hearsay.  Defense counsel responded by arguing that *Touhy* was inapplicable because Agent Tucker had conducted his interview of Stewart under the direction of the United States Justice Department, and Agent Tucker's testimony was not hearsay because he just used it to show Stewart had made prior inconsistent statements, not for the truth of those prior statements.  As for the government's contention that Agent Tucker's testimony was collateral, Steele responded that it was not because it bore on the key issue of whether he had the opportunity to submit the false returns to the government by staying late and avoiding supervisory review.

Ultimately, the district court sustained the government's objection. The court concluded that Agent Stewart's testimony would be hearsay and that Steele had neglected to comply with the IRS's *Touhy* regulations, and in any event, Agent Stewart's testimony was too collateral.

Steele then took the stand on his own behalf. He testified that he had no training preparing taxes and that he did not file any tax returns for Max Tax from 2009 to 2011. And while Steele conceded that he would sometimes receive customers' W-2s, he insisted he never prepared or submitted their tax returns. He also stated he did not keep long hours at Max Tax. To the contrary, Steele asserted, Stewart was the one who worked from 8:00 a.m. until 8:00 p.m. In addition, Steele denied trying to dissuade any witness from cooperating with the IRS.

In closing, the government leaned on Tate's, Washington's, and Taylor's testimony. In particular, the government reminded the jury that these witnesses had provided their W-2s to Steele and had waited around at Max Tax for their tax returns to be completed. It further emphasized it was Steele who subsequently emerged and announced these witnesses' returns were completed. The government, as in its opening, also noted Stewart's testimony that Steele had the opportunity to commit tax fraud because his work was not subject to supervisory review, and he worked long hours in order to submit the falsified returns.

The jury returned a verdict convicting Steele on four counts of tax fraud—Counts 3 through 7—and on one count of witness tampering—Count 9.  Steele was sentenced to 36 months' imprisonment for each of Counts 3 through 7, and 42 months' imprisonment for Count 9, all to be served concurrently.

On appeal, Steele raises two interrelated challenges to the district court's refusal to allow him to call Agent Tucker to impeach Stewart.  First, Steele contends that the district court erred in denying him the opportunity to present Agent Tucker's testimony, since it would not have constituted hearsay but rather, impeachment testimony.  He further asserts this was not a collateral issue because, left unrebutted, Stewart's testimony established Steele had the opportunity to commit tax fraud.  Second, he argues the district court's exclusion of Agent Tucker's testimony violated his Fifth Amendment right to present witnesses in his own defense and his Sixth Amendment right to compulsory process for witnesses in his favor.

## II.

We employ the abuse-of-discretion standard when reviewing the district court's decision to admit or exclude evidence.  *See, e.g., United States v. Smith*, 122 F.3d 1355, 1357 (11th Cir. 1997).  In deploying this standard, we will affirm, "unless the district court has made a 'clear error of judgment' or has applied an 'incorrect legal standard.'"  *Conroy v. Abraham Chevrolet-Tampa, Inc.*, 375 F.3d 1228, 1232 (11th Cir. 2004) (quoting *Piamba Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1305

10

(11th Cir. 1999)).  The harmless-error doctrine, which applies to evidentiary rulings, further constrains our review.  *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005); *United States v. Wilson*, 983 F.2d 221, 223 (11th Cir. 1993); Fed. R. Crim. P. 52(a) (providing that, under the harmless error standard, "[a]ny error . . . that does not affect substantial rights must be disregarded").  Because of it, we will not reverse evidentiary errors if they had no substantial influence on the verdict and enough evidence supports the verdict, notwithstanding the error.  *United States v. House*, 684 F.3d 1173, 1197 (11th Cir. 2012).

As for constitutional errors, our review is more exacting.  *See United States v. Guzman*, 167 F.3d 1350, 1353 (11th Cir. 1999).  If an error of that magnitude occurs, we must "be able to declare a belief that it was harmless beyond a reasonable doubt" in order to affirm.  *Id.* (quotation and citation omitted).  Therefore, on direct review, Sixth Amendment violations are subject to this standard.  *United States v. Hernandez*, 141 F.3d 1042, 1049 (11th Cir. 1998).  When the alleged erroneous exclusion of evidence occurred "during the presentation of the case to the jury, [the error can be] quantitatively assessed in the context of other evidence presented in order to determine the effect it had on the trial."  *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993) (internal citations and quotation marks omitted).

Even though constitutional errors "must be proven to be harmless beyond a reasonable doubt and nonconstitutional errors must merely be shown to have not

caused actual prejudice, both standards require the reviewing court to consider the entire trial record when making the determination of harmless error."   For both standards, "[o]verwhelming evidence of guilt" can be decisive in finding harmless error. *Guzman*, 167 F.3d at 1353; *see also Hernandez*, 141 F.3d at 1049–51 (finding that exclusion of impeachment evidence was harmless because the evidence presented of guilt was substantial).

Here, we need not decide whether Steele could succeed on the merits of his constitutional or evidentiary arguments because even assuming that he could, overwhelming evidence satisfies both harmlessness standards.

To illustrate, for all four tax-fraud convictions, each victim testified that he or she had given W-2s and other financial information to Steele, waited at Max Tax while the returns were completed, and identified Steele as the person who told them that the returns had been completed and the general amount they could expect for a refund.   They all further attested that their returns claimed deductions that had no basis in reality.   And they likewise testified that Steele was the only person they interacted with at Max Tax.

In particular, Jeannet Washington testified that after she gave Steele the necessary documentation to complete her tax returns for 2009 and 2010, she watched Steele fill out the returns, and once he completed them, he told her how much she

could expect by way of a tax refund.  Alisa Tate gave a materially similar account about her tax returns, in support of Counts 3 and 4.

For her part, Katrina Taylor's testimony supported both convictions for tax fraud and witness tampering.  She testified that she gave Steele her W-2 and her last pay stub and waited at Max Tax for her return to be completed.  Steele eventually called her back to his desk and had her sign the completed return.  Months later, Taylor stated, Steele offered her $200 to tell the IRS that "a lady with red hair did [her] taxes."

Considering this glut of evidence demonstrating Steele's guilt, we conclude with firm assurance that any errors the district court committed in precluding Steele from calling Agent Tucker were harmless beyond a reasonable doubt.  *See, e.g., De Lisi v. Crosby*, 402 F.3d 1294, 1302 (11th Cir. 2005) ("Because the addition of the tax returns to this already ample evidence [of guilt] would not have substantially changed the jury's view of White's bias or credibility, the error of the trial court in permitting White to assert his Fifth Amendment privilege cannot be said to have had substantial and injurious effect or influence in determining the jury's verdict.") (internal citations and quotation marks omitted).

Although Steele tries to paint Stewart as the government's star witness because she gave direct evidence that he had the opportunity to commit tax fraud, Tate, Taylor, and Washington provided ample circumstantial evidence that Steele

13

had the opportunity to falsify their returns, and, in fact, falsified their tax returns. *See, e.g., United States v. Henderson*, 693 F.2d 1028, 1030 (11th Cir. 1982) (restating the blackletter rule that the law does not play favorites among direct and circumstantial evidence because "[c]ircumstantial evidence can be and frequently is more than sufficient to establish guilt beyond a reasonable doubt"); *cf. United States v. Watson*, 669 F.2d 1374, 1383 (11th Cir. 1982) (holding constitutional error was not harmless where the witness, whom the district court refused to let the defendant impeach, "was the lynchpin to the government's case [and] the only testimony to link all the appellants in a single conspiracy").

Three additional points further bolster our confidence that any errors the district court may have committed were harmless beyond a reasonable doubt. First, impeaching Stewart's testimony would not have changed the outcome here. Steele was convicted of assisting in falsifying returns, so whether or not he physically submitted returns to the IRS did not matter, in light of Tate's, Taylor's, and Washington's testimony. *See United States v. Wolfson*, 573 F.2d 216, 225 (5th Cir. 1978) (holding that the defendant does not need to sign or prepare the tax returns in order to be guilty of willfully aiding and assisting in their preparation).[3]

---

[3] The decisions of the former Fifth Circuit handed down before October 1, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*).

14

Second, Steele took the stand, testifying that he had never prepared taxes, let alone prepared false returns, never worked long hours, and never persuaded witnesses to tell the IRS that somebody else had prepared false returns. In doing so, he ran the risk that the jury would conclude the "opposite of his testimony [wa]s true." *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995) (quoting *Atkins v. Singletary*, 965 F.2d 952, 961 n. 7 (11th Cir. 1992)). And under *Brown*, if the jury inferred from Steele's testimony that he had falsified tax returns and tampered with witnesses, the jury could have relied on Steele's testimony "as substantive evidence of the defendant's guilt." *Id.* Particularly in combination with the testimony of Tate, Washington, and Taylor, the jury's rejection of Steele's testimony established the harmlessness beyond a reasonable doubt of any error in the district court's failure to permit Agent Tucker's testimony.

Finally, for Counts 3, 5, and 9, Stewart's testimony was of little, if any, significance, anyway. That's because Steele falsified two of the returns—those charged in Counts 3 and 5—in 2010, a year before Stewart even started working at Max Tax. And Stewart's testimony might have been even less valuable for Count 9—Steele's witness tampering conviction—because Stewart gave absolutely no testimony about Steele's attempted coercion of Taylor; instead, Taylor herself provided all of the testimony supporting that conviction. So we are satisfied beyond

a reasonable doubt that any errors by the district court in declining to allow Steele to present Agent Tucker's testimony were harmless beyond a reasonable doubt.

While the harmless-error standard is difficult to meet when applied to alleged constitutional errors, it is nonetheless satisfied here. And since we hold that the district court's purported constitutional errors were harmless beyond a reasonable doubt, the lower standard for measuring the harmlessness of evidentiary errors is also satisfied. Accordingly, we affirm the district court's exclusion of Agent Tucker's impeachment testimony.

## III.

For the foregoing reasons, the judgment of the district court is affirmed.

**AFFIRMED.**