[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 11, 2007
THOMAS K. KAHN
CLERK

_____

No. 05-14659

_____

D. C. Docket No. 05-60022-CR-WPD

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FEDNERT ORISNORD,
THEODORE WITHERSPOON,
BERNARD DONJOIE,
a.k.a. Jean Pierre,
JONIEL POLYNICE,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(April 11, 2007)**

Before BLACK, MARCUS and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

Defendants-Appellants, Bernard Donjoie ("Bernard"), Fednert Orisnord ("Orisnord"), Joniel Polynice ("Polynice"), and Theodore Witherspoon ("Witherspoon") appeal their convictions for conspiracy to commit a Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count 1); conspiracy (Count 2) and attempt (Count 3) to possess with intent to distribute cocaine, both in violation of 21 U.S.C. § 846; using, carrying, and possessing a firearm during and in relation to a crime of violence and a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count 4); and possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g) (Count 5), all in connection with a conspiracy to rob a narcotics stash house. Polynice, Witherspoon, and Bernard also appeal their sentences. For the reasons that follow, we reverse Witherspoon's firearm convictions, vacate his sentence, and remand to the district court for resentencing. We affirm the convictions and sentences of the remaining Appellants.

## I. Background

In December of 2004, a confidential informant ("CI") informed federal agents from the Bureau of Alcohol, Tobacco, and Firearms ("ATF") that Orisnord and others were interested in committing home invasion robberies of narcotics stash houses. Based on this tip, ATF Special Agent Michael Connors ("Connors"),

2

acting undercover, met with Orisnord and the CI in Sunrise, Florida on December 29, 2004. Connors told Orisnord that he performed security for a Colombian drug organization, that his employers owned a cocaine stash house in Fort Lauderdale, and that he was looking for people to help him rob the stash house. Conners also told Orisnord that the stash house usually contained 20 to 25 kilograms of cocaine and that his Colombian bosses often moved the "stash" to different locations. Indicating that he had performed several robberies in the past, Orisnord agreed to assemble a team to rob the stash house. He also agreed to give Connors four kilograms of cocaine as his share of the robbery proceeds.

On January 6, 2005, Connors and the CI met with Orisnord and Sonny Hilaire, who Orisnord introduced as one of his "boys" who would be performing the "lick" with him. During a telephone conversation a few days later, Orisnord told Connors that there was a problem with Hilaire's participation, but that he was still interested in performing the robbery. On January 18, 2005, Connors called Orisnord and told him that a shipment of cocaine was arriving the next day. After Orisnord indicated that his team was ready, Orisnord and Connors scheduled the robbery for the night of January 19, 2005. The plan called for the CI to pick up Orisnord's robbery team in a vehicle ostensibly belonging to Connors' girlfriend. They would meet with Connors at an unspecified location to review the final

3

details and wait for Connors' Colombian employers to call and give him the stash-house address. The team would then drive to the stash house in a rental car provided by Connors.

On January 19th, driving a BMW supplied by Connors that was equipped with video and audio recorders as well as a global-positioning-system transmitter, the CI picked up Orisnord and Witherspoon in Fort Lauderdale. They then drove to Pompano Beach to pick up Polynice. While in route to Pompano, the CI asked Witherspoon if he was "ready to get down." Witherspoon responded by saying "Yeah, damn right. [Orisnord] had told me about it like a couple of weeks ago." Witherspoon later said that he did not have a pistol, but that Orisnord told him not to worry because "we got that."

Once in Pompano, Polynice got into the BMW and both he and Witherspoon asked Orisnord to explain the plan. After Orisnord responded that Connors would explain everything, Polynice said that he was "ready to roll" and asked Orisnord if Orisnord had procured a gun for him. Orisnord responded that they would get pistols at a later time and that they would need three. Orisnord then explained that the plan was to "go over there, we gonna get the money and the dope, then we gonna get [Connors]. We gonna give [Connors] three keys[1] and we gonna keep the

_____

[1] As discussed above, Orisnord and Connors originally agreed that Connors would receive four kilograms of cocaine for his participation. Other than this single reference to "three

4

rest." Polynice responded, "Right now, we stand as one."

After returning to Fort Lauderdale, the CI, Orisnord, Polynice, and Witherspoon met Connors at a Hess gas station. Connors reiterated that the robbery was to occur that night, that the team was to follow him to an undisclosed location to await the call from the Colombians, and that they should have their firearms ready. Orisnord stated that the team did not have their firearms because he believed Connors merely wanted to meet the other team members at the Hess station. Orisnord also indicated that he thought the team would be given another vehicle and would then have a chance to procure their firearms. Orisnord then asked Connors to explain the robbery plan to Polynice and Witherspoon, and Connors did so. Polynice asked how many men would be in the stash house, and Connors explained that there would be two armed men. Polynice responded that Connors had told him all he needed to know. Orisnord reiterated that they would need three guns and said he needed five minutes to get his. Polynice stated that they had to get "the fire" and "the tools." During this exchange, Connors observed Witherspoon nodding in apparent understanding. When Witherspoon got back into the BMW, the CI asked him what was happening. Witherspoon responded that Connors' bosses were to "bring in dope," that there was a "house," and that there

keys," both Orisnord and Connors continued to repeat the four-kilogram figure.

5

would be "20 to 25 keys" inside the house.

After the meeting with Connors, the CI, Orisnord, Witherspoon, and Polynice drove to Pompano. Upon arriving at a housing project, Orisnord entered an apartment occupied by approximately ten people and asked if anyone had seen "Sonny." Approximately 20 minutes later, the CI entered the same apartment and asked if anyone had seen "Face" (which was one of Orisnord's aliases). Addressing everyone in the apartment, including brothers Henry and Bernard Donjoie, the CI stated that a "big deal" with "a lot of money" was going down, that he was driving a BMW belonging to his boss's wife, and that anyone interested in the "deal" should accompany him to meet his boss to learn the details. Henry and Bernard accepted the invitation and joined the other team members to learn more about this "deal." Sometime later, the CI, Orisnord, Witherspoon, Polynice, and the Donjoies got into the BMW and traveled back to Fort Lauderdale to meet with the CI's boss (Connors) and discuss the "deal." Although no one mentioned firearms during the drive, Orisnord phoned Connors and said that they were now "all set."

Upon arriving in Fort Lauderdale, the team stopped at a Citgo gas station. Orisnord exited the BMW and conversed with the occupants of a Buick parked at the station. Orisnord then returned to the BMW, and both vehicles traveled to a

6

Hess station where Connors awaited. When the vehicles entered the Hess parking lot, Connors pulled his car in front of the BMW and the Buick, and both vehicles followed Connors to a warehouse. Connors' vehicle and the BMW parked in the warehouse parking lot, while the Buick parked across the street. The CI and the other occupants of the BMW entered the warehouse with Connors.

Because the Donjoie brothers were the last to meet Connors, Orisnord instructed Connors to "[t]ell those two what's going on. Explain to them the deal." Connors explained that he worked security for Colombians who had a stash house containing 20 to 25 "keys," that there were two or three armed guards in the stash house, that the Colombians moved the stash around such that he did not yet know the address, and that once the Colombians phoned him to provide the address, the team would drive to the house and perform the robbery. Connors further explained that to conceal his involvement in the robbery, one of the crew members should strike him on the head. Henry asked Connors several questions about the plan, such as how many armed guards would be in the house; where "it" would be located; whether there were "more people to pick up more packages;" and where they would need to leave Connors' share. Once Connors answered those questions, Henry said that the "garage is the only way to go," and that the "shit is already in the house." At some point, Orisnord asked Connors how many "keys"

7

he wanted, Connors responded that he wanted four, and Henry replied: "Four. That's fine. That's yours. That's guaranteed." Bernard also responded that Connors was "guaranteed that." After Connors instructed the team to place his four keys under the BMW, Henry said they would "put it in a trash bag" under the car. Bernard said that they would be "In and out and that's it." Connors then asked if the team "had enough fire to take care of it," and one of the team members responded "[d]on't you worry about that" because the "fire is in the car."

Based on these discussions, Agent Connors determined that the team members were capable of, and committed to, carrying out the robbery, and that none of them had evinced a clear desire to withdraw. He gave the arrest signal, and a SWAT team moved in. Approximately ten minutes after the arrests, Agent Leonard Coy entered the warehouse and searched the defendants, finding a loaded pistol, black gloves, and a knit hat on Henry; a loaded pistol and black gloves on Polynice; and a loaded pistol and black gloves on Bernard. Officers also discovered two black stocking caps in the front passenger seat of the BMW where Orisnord had been sitting.

While sitting together in the back of a police car following their arrests, Orisnord and Bernard discussed their plight. Bernard blamed Orisnord, and Orisnord agreed that he was at fault. Bernard also complained that Orisnord was a

8

"rookie." Orisnord said that he would exonerate Bernard by claiming that the entire scheme was his idea, that all of the pistols were his, and that Bernard knew nothing.

A grand jury returned an indictment against the defendants, charging them with conspiracy to commit a Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count 1); conspiracy (Count 2) and attempt (Count 3) to possess with intent to distribute cocaine, both in violation of 21 U.S.C. § 846; using, carrying, and possessing a firearm during and in relation to a crime of violence (referring to Count 1) and a drug trafficking crime (referring to Counts 2 and 3), in violation of 18 U.S.C. § 924(c)(1)(A) (Count 4); and possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g) (Count 5). Following a trial, the defendants were convicted on all counts.[2] The ensuing sentences ranged from 387 months' imprisonment for Witherspoon to 420 months' imprisonment for the remaining defendants.

## II. Discussion

On appeal, Appellants argue that the evidence was insufficient to sustain their convictions. In addition, Polynice, Witherspoon, and Bernard argue that:

---

[2] Before trial, Henry Donjoie's case was severed. In his separate trial, he was convicted on all counts charged in the indictment.

they were entrapped by government agents; the Government violated their due process rights by engaging in outrageous conduct; the district court violated the Confrontation Clause by improperly restricting the cross-examination of Agent Connors; and improper comments made by the Government during closing arguments denied them a fair trial. Polynice and Witherspoon also challenge the district court's denial of their motions to conduct post-verdict interviews of two jurors. Finally, Polynice, Witherspoon, and Bernard challenge their sentences.

Based on careful review of the record and the parties' arguments, we conclude that the evidence was sufficient to uphold the drug conspiracy, attempt, and firearm convictions of Bernard, Orisnord, and Polynice, and we affirm those convictions without further discussion. We likewise conclude that the due process and closing argument challenges raised by Bernard, Polynice, and Witherspoon are without merit, and we do not discuss them further.[3] We also hold that Witherspoon's drug conspiracy and attempt convictions are supported by sufficient evidence and do not warrant further discussion. Based on the record and the Government's concession, however, we conclude that the evidence was

_____

[3] Although Appellants properly preserved their sufficiency-of-the-evidence challenges, they failed to preserve their due process and closing-argument challenges. Thus, the standard of review for these unpreserved issues is plain error. United States v. Williams, 445 F.3d 1302, 1307 (11th Cir. 2006). Based on a thorough review of the record, Appellants have failed to meet the plain error standard.

10

insufficient to sustain Witherspoon's firearms convictions (Counts 4 and 5).

Accordingly, we reverse those convictions without further discussion, vacate

Witherspoon's sentence, and remand to the district court for resentencing.

We now address Appellants' arguments regarding (A) their convictions for

conspiracy to violate the Hobbs Act, (B) entrapment, (C) the Confrontation Clause,

(D) juror interviews, and (E) sentencing.

## A. Hobbs Act Conspiracy

Polynice, Witherspoon, and Bernard argue that the evidence was insufficient

to sustain their Hobbs Act conspiracy convictions. We review the sufficiency of

the evidence de novo, viewing "the evidence in the light most favorable to the

government, with all reasonable inferences and credibility choices made in the

government's favor." United States v. Martinez, 83 F.3d 371, 374 (11th Cir.

1996). We will uphold a district court's denial of a motion for a judgment of

acquittal unless there is no reasonable construction of the evidence under which a

reasonable trier of fact could have found the defendant guilty beyond a reasonable

doubt. United States v. Garcia, 405 F.3d 1260, 1269 (11th Cir. 2005).

"The Hobbs Act prohibits robbery or extortion, and attempts or conspiracies

to commit robbery or extortion, that in any way or degree obstruct, delay, or affect

commerce or the movement of any article or commodity in commerce." United

11

States v. Diaz, 248 F.3d 1065, 1084 (11th Cir. 2001) (citation and internal punctuation marks omitted). Because the Hobbs Act, by its own terms, encompasses the inchoate offenses of attempt and conspiracy, the interstate nexus required to prove a Hobbs Act conspiracy may be established upon evidence that *had* the conspiratorial objective been accomplished, interstate commerce *would have been* affected. United States v. Le, 256 F.3d 1229, 1233 (11th Cir. 2001); United States v. Kaplan, 171 F.3d 1351, 1354 (11th Cir. 1999) (holding that "the government need only show a realistic probability of an effect" on interstate commerce). Thus, to prove a Hobbs Act conspiracy, the impact on interstate commerce is measured from the time the objective of the conspiracy is established. See Le, 256 F.3d at 1232, 1232 n.3 (citing United States v. Nguyen, 246 F.3d 52, 54 (1st Cir. 2001)). And factual impossibility is no defense to an inchoate offense under the Hobbs Act. United States v. Rodriguez, 360 F.3d 949, 955-57 (9th Cir. 2004); United States v. Clemente, 22 F.3d 477, 480-81 (2d Cir. 1994); United States v. DiCarlantonio, 870 F.2d 1058, 1061 (6th Cir. 1989); United States v. Jannotti, 673 F.2d 578 (3d Cir. 1982). Accordingly, this court recently held that the interstate nexus was satisfied when the defendant conspired to rob the stash house of a narcotics organization, even though both the narcotics and the organization were fictional. United States v. Taylor, --- F.3d ----, ---, No.

12

05-14562, 2007 WL 652160, at *2 (11th Cir. Mar. 6, 2007).

Here, after a thorough review of the record, we conclude that the evidence was sufficient to establish beyond a reasonable doubt that an agreement existed to rob the stash house of a narcotics organization; Polynice, Witherspoon, and Bernard knew of that agreement; and with that knowledge, they voluntarily participated in helping to accomplish the objective of that agreement. See Diaz, 248 F.3d at 1084. We also conclude that the interstate nexus was sufficient because, as in Taylor, the conspiratorial aim was to rob the stash house of a narcotics organization. That neither the narcotics nor the intended victims actually existed is irrelevant. Taylor, --- F.3d at ---, 2007 WL 652160, at *2. Accordingly, we hold that the evidence was sufficient to sustain Appellants' Hobbs Act conspiracy convictions.

### B. Entrapment Defense

Polynice, Witherspoon, and Donjoie argue that the district court erroneously denied them judgments of acquittal on the ground that the government failed to rebut their entrapment defense, as there was insufficient evidence to establish that they were predisposed to commit the charged offenses. We review this preserved claim de novo, viewing all facts and making all inferences in favor of the Government. United States v. King, 73 F.3d 1564, 1568 (11th Cir. 1996).

13

Entrapment is an affirmative defense. United States v. Quinn, 123 F.3d 1415, 1423 (11th Cir. 1997). There are two elements to an entrapment claim: (1) government inducement of the crime and (2) the defendant's lack of predisposition to commit the crime before the inducement. United States v. Ryan, 289 F.3d 1339, 1343 (11th Cir. 2002). "[T]he defendant bears the initial burden of production as to government inducement[,]" and he may meet this "burden by producing any evidence sufficient to raise a jury issue that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it." Id. at 1343-44 (citation omitted). "The defendant may make such a showing by demonstrating that he had not favorably received the government plan, and the government had to 'push it' on him or that several attempts at setting up an illicit deal had failed and on at least one occasion he had directly refused to participate." United States v. Andrews, 765 F.2d 1491, 1499 (11th Cir. 1985) (internal citations omitted). Once the defendant produces sufficient evidence of inducement, the government must prove beyond a reasonable doubt that the defendant was predisposed to commit the offense. Id.

Here, there was no evidence that either the CI or Agent Connors did anything to "induce" Appellants' participation in the robbery plan. Nothing in the record demonstrated that either the CI or Connors had to "push" the robbery

14

scheme on them, that multiple attempts at setting up the robbery had failed, or that any of the defendants had clearly evinced a refusal to participate. Because Appellants did not meet their burden of demonstrating government inducement, the government was not required to prove beyond a reasonable doubt that Appellants were predisposed to commit the charged offenses. See Andrews, 765 F.2d at 1499. Thus, the district court did not err in rejecting Appellants' entrapment defense.

### C. Confrontation Clause

Polynice, Witherspoon, and Bernard argue that the district court violated the Sixth Amendment's Confrontation Clause by improperly restricting cross-examination of Agent Connors regarding SWAT team arrest methods. We review the district court's decisions limiting cross-examination for abuse of discretion. United States v. Tokars, 95 F.3d 1520, 1531 (11th Cir. 1996).

The Confrontation Clause is violated if a criminal defendant can demonstrate that he was prohibited from engaging in otherwise appropriate cross-examination designed to show "bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness." De Lisi v. Crosby, 402 F.3d 1294, 1300 (11th Cir. 2005) (citation and internal punctuation marks omitted). "Not every limitation on cross-examination violates the Confrontation Clause." Id. at 1301.

15

Thus, although "cross-examination of a government 'star' witness is important, and a presumption favors free cross-examination on possible bias, motive, ability to perceive and remember, and general character for truthfulness," the mere fact that defense counsel sought to explore a prosecution witness's bias does not automatically invalidate "the court's ability to limit cross-examination." United States. v. Lyons, 403 F.3d 1248, 1256 (11th Cir. 2005) (citations omitted). "The test for the Confrontation Clause is whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." United States v. Garcia, 13 F.3d 1464, 1469 (11th Cir. 1994) (citations omitted). "As long as sufficient information is elicited from the witness from which the jury can adequately assess possible motive or bias, the Sixth Amendment is satisfied." De Lisi, 402 F.3d at 1301 (quoting United States v. Lankford, 955 F.2d 1545, 1549 n.10 (11th Cir.1992)).

Here, Agent Connors testified that the video camera in the warehouse was turned off just before Appellants' arrests in order to protect the confidentiality of SWAT team arrest methods. When defense counsel asked the district court to direct Connors to answer questions about the precise tactical methods he claimed the ATF was trying to protect, the court refused on the grounds that these methods constituted a collateral issue. According to Appellants, had they been allowed to

more thoroughly cross-examine Connors about these tactical methods, they would have demonstrated that Connors was lying about why the video camera was turned off, thereby impeaching the credibility of the Government's star witness. They also argue that additional questioning would have demonstrated that the "real reason" the video camera was turned off was that a video would have shown that Appellants did not possess guns at the time of their arrests.

In our view, defense counsel had elicited ample evidence to enable the jury to assess Agent Connors' credibility. Given Polynice's testimony that the arrests involved nothing out of the ordinary and Agent Coy's testimony that he was not inside the warehouse during the arrests (although he testified unequivocally that he found guns on Polynice, Bernard, and Henry), defense counsel had a sufficient evidentiary basis to argue that the video recorder was stopped for nefarious reasons rather than to preserve arrest tactics. We therefore conclude that the district court's limitation on the cross examination did not violate the Confrontation Clause.

### D. Post-Trial Requests to Interview Jurors

Polynice and Witherspoon challenge the district court's denial of their motions to interview certain jurors following the verdict. We review a district court's refusal to permit juror interviews for abuse of discretion. United States v. Hooshmand, 931 F.2d 725, 737 (11th Cir. 1991).

17

Under Southern District of Florida Local Rule 11.1E, after the jury is discharged, upon application in writing, the district court may allow counsel to interview jurors to determine if the verdict is subject to legal challenge. S.D. Fla. R. 11.1E. In Hooshmand, this court held that the district court *did not* abuse its discretion when, under the predecessor of S.D. Fla. R. 11.1E, it refused to permit defense counsel to interview a juror who had told the district court "I voted for [the verdict], but it was not my verdict. . . . I had no choice. It was 11 to 1. It had to be unanimous. . . . They wanted to get on with other trials." Hooshmand, 931 F.2d at 737. In United States v. Cuthel, 903 F.2d 1381, 1382 (11th Cir. 1990), this court upheld a district court's authority, under the same local rule, to deny defense counsel's request to interview jurors where one juror had telephoned the defendant and said "we were pressured into making our decision." Id. And in O'Rear v. Fruehauf Corp., 554 F.2d 1304, 1309-10 (5th Cir. 1977),[4] the former Fifth Circuit affirmed the district court's denial of defense counsel's interview request where the defendant alleged that a juror was seen speaking with courtroom spectators during a recess but presented no evidence demonstrating improper conveyance of information to the jury. Id.

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions handed down by the former Fifth Circuit before the close of business on September 30, 1981.

18

### 1. Motion to Interview Juror Cetoute

Approximately two months after the verdict was rendered, Polynice filed a sealed motion to interview Juror Cetoute regarding an alleged extrinsic contact with a non-juror during deliberations. During Polynice's sentencing hearing, the district court allowed Polynice's counsel to discuss the motion to interview Cetoute and to present a witness in support of the motion. The witness, Celia Metayer (Polynice's sister), testified that during jury deliberations, she saw Juror Cetoute at a McDonald's restaurant. Metayer claimed that she overheard Cetoute say to a non-juror: "Well you know those boys—those boys got felony anyway," and that "We asked the Judge for questions—we have a lot of questions. We asked him for help. He won't help us. And those boys got felonies. We are going to take a vote on it." According to Metayer, the non-juror responded "What are you talking about?" Metayer could not remember the precise day on which this exchange occurred, and she claimed that she did not immediately report the incident to defense counsel because she was "afraid of the law." She did not relay this information to her brother, Polynice, until after the verdict, at which time Polynice informed his counsel.

In a written order, the district court denied Polynice's motion to interview Juror Cetoute, concluding that the evidence "did not rise to the level needed for a

juror interview." The court held that even accepting Metayer's testimony as true, there were no allegations of external influence on the jurors, there was no indication that an outside influence affected the verdict, and there was no substantial and incontrovertible evidence that a specific, nonspeculative impropriety occurred that could have prejudiced Polynice. On appeal, Polynice argues that the district court abused its discretion by denying his motion. We disagree.

As the district court concluded, even if Metayer's account is accepted, at most, it demonstrates that Juror Cetoute disobeyed the district court's instruction to not discuss the case. Polynice does not argue that extraneous prejudicial information was brought to Juror Cetoute's attention, that extraneous information entered into her decisionmaking, or that she was subject to improper outside influence. Under our case law, the district court did not err when it refused to allow Polynice's counsel to interview Juror Cetoute.

### 2. Motion to Interview Juror Whitehead

After the verdict was read, the court clerk polled the jury as to whether they concurred in the verdict. During the polling, Witherspoon engaged in a disruptive outburst causing the court to suspend polling midway through the process. After the polling was completed and the jury dismissed, Witherspoon's counsel made a

20

motion to interview Juror Whitehead, noting that Whitehead had hesitated before affirming his concurrence in the verdict. The district court denied this motion as well as a subsequent motion for a mistrial, stating that although Whitehead "did hesitate for a few seconds, he eventually said 'Yes.'" The court explained that "My guess is the reason that he hesitated was because it was an emotional experience to hear all that screaming going on in the courtroom from what I assume were relatives of the defendants. So had we gone sidebar I wouldn't have inquired any more of Juror [Whitehead]."

Approximately three months later, Witherspoon filed a written motion to interview Juror Whitehead, which Polynice later adopted, based on Whitehead's hesitant affirmation of the verdict and the fact that the jury's original jury form reflected a "not guilty" verdict for Witherspoon on the firearms counts. In his written motion, Witherspoon referenced codefendant Polynice's allegation of extrinsic contact with Juror Cetoute and argued that this extrinsic contact coupled with Whitehead's hesitation "trigger[ed] the need for an investigation through juror interview." In a written order, the district court denied Witherspoon's motion. The court stated that after reviewing the audiotape of the proceedings, it determined that there was a time-gap "of at least 1.5 and not more than 3 seconds" between the clerk asking Juror Whitehead to affirm his verdict and Whitehead's response. The

21

court also noted that Witherspoon's outburst began even before the clerk had polled Juror #1 (Whitehead was Juror #3). The court held that "a juror who allegedly violated the court's admonition by talking about the case to a non-juror at McDonald's during an evening recess . . . and a juror who pauses less than three seconds before affirming his verdict during a poll, do not individually nor cumulatively merit" granting Witherspoon's motion to interview Juror Whitehead. In a subsequent order, the court denied Polynice's adopted motion for the same reasons it denied Witherspoon's motion.

In our view, Witherspoon and Polynice's allegation of juror impropriety is weaker than the allegations in the cases discussed above. See Hooshmand, 931 F.2d at 737; Cuthel, 903 F.2d at 1382; O'Rear, 554 F.2d at 1309-10. Given that Whitehead's hesitation was, at most, three seconds and was plausibly attributable to Witherspoon's emotional outbursts, we conclude that the district court did not abuse its discretion in denying the motions to interview Juror Whitehead.

### E. The Sentences

Witherspoon,[5] Polynice, and Bernard challenge their sentences on various grounds. We review a defendant's overall sentence for reasonableness, United

---

[5] Witherspoon argues that the district court erred in denying a mitigating-role reduction of his sentence and that his total sentence was unreasonable. We do not address these issues, however, because, as discussed above, we reverse Witherspoon's firearms convictions (Counts 4 and 5), vacate his sentence, and remand to the district court for resentencing.

States v. Winingear, 422 F.3d 1241, 1246 (11th Cir. 2005), the district court's legal interpretation of the Sentencing Guidelines de novo, United States v. Gunn, 369 F.3d 1229, 1237-38 (11th Cir. 2004), and factual findings, such as a defendant's role in the offense, for clear error, United States v. De Varon, 175 F.3d 930, 934 (11th Cir. 1999).

### 1. Polynice's Career-Offender Enhancement

In sentencing Polynice, the district judge imposed a career-offender enhancement based on Polynice's two previous felony convictions—one for resisting arrest with violence and the other for fleeing and eluding law enforcement, both in violation of Florida law. On appeal, Polynice challenges the enhancement.

Under the Guidelines, a defendant is a career offender if (1) he was at least 18 years old at the time of the instant offense; (2) the instant offense is a felony that is either a crime of violence or involves a controlled substance; and (3) he has at least two prior felony convictions of either a crime of violence or a controlled substance offense. U.S.S.G. § 4B1.1(a). A "crime of violence" is a federal or state offense carrying a sentence of more than one year imprisonment and, inter alia, "involve[ing] conduct that *presents a serious potential risk of physical injury to another*." U.S.S.G. § 4B1.2(a)(2) (emphasis added). The first predicate crime of

23

violence relied upon by the district court, resisting arrest with violence, is not in dispute. Polynice does challenge, however, the district court's characterization of the Florida offense of felony fleeing and eluding law enforcement as a crime of violence for purposes of the Guidelines' career-offender enhancement.[6]

At the time of Polynice's conviction for fleeing and eluding, Florida law provided that one commits a second-degree felony if he "willfully flees or attempts to elude a law enforcement officer . . . and during the course of the fleeing or attempted eluding . . . [d]rives at high speed, or in any manner which demonstrates a wanton disregard for the safety of persons or property." Fla. Stat. § 316.1935(3). The issue of whether "fleeing and eluding" under this provision constitutes a "crime of violence" for purposes of § 4B1.2 is one of first impression in this circuit. But at least three other circuits have addressed the issue regarding "fleeing and eluding" under the laws of other states. Focusing on the "potential risk" of injury as the touchstone of § 4B1.2's definition of a "crime of violence," the Sixth, Seventh, and Eighth Circuits, construing Michigan, Wisconsin, and Oregon law, respectively, have held that felony fleeing is a "crime of violence" for purposes of § 4B1.2. See United States v. Kendrick, 423 F.3d 803, 809 (8th Cir. 2005) (holding that felony fleeing under Oregon law constitutes a crime of violence for

_____

[6] Polynice does not dispute that he was at least 18 years old at the time of the instant offenses or that some or all of the instant offenses were crimes of violence.

24

purposes of § 4B1.2); United States v. Rosas, 410 F.3d 332, 335-36 (7th Cir. 2005) (holding that because Seventh Circuit precedent provides that fleeing law enforcement and endangering the operation of a police vehicle, in violation of a Wisconsin law, is, by definition, a "violent felony," it is also a "crime of violence" for purposes of § 4B1.2); United States v. Martin, 378 F.3d 578, 582-84 (6th Cir. 2004) (holding that "fleeing and eluding" under Michigan law is a crime of violence for purposes of § 4B1.2 because it involves a serious potential risk of physical injury).

Conversely, the Ninth Circuit has held that "fleeing and eluding" under a Washington statute similar to the statute at issue here is *not* a crime of violence for purposes of § 4B1.2 because, inter alia, the statute did not require that anyone actually be *endangered* by the defendant's conduct to sustain a conviction. United States v. Kelly, 422 F.3d 889, 896 (9th Cir. 2005).

We find the reasoning of the Sixth, Seventh, and Eighth Circuits persuasive. As noted above, the language of the Guidelines makes clear that the "potential risk" of injury, rather than actual violence or actual injury, is the touchstone of a "crime of violence." U.S.S.G. § 4B1.2(a). The dangerous circumstances surrounding a person's attempt to flee from law enforcement coupled with the person's operation of a motor vehicle most assuredly presents a "potential risk of

physical injury" to others. And the stress and urgency of the situation will likely cause the person fleeing to drive recklessly, turning any pursuit into a high-speed chase with the potential for serious harm to pedestrians, other drivers, and the pursuing officers. See Kendrick, 423 F.3d at 809; Martin, 378 F.3d at 582. Indeed, collisions between fleeing vehicles and pedestrians or other vehicles sharing the road are common. United States v. Howze, 343 F.3d 919, 922 (7th Cir. 2003). Moreover, by deliberately disobeying a law enforcement officer, the fleeing motorist provokes an inevitable, escalated confrontation with the officer when he is finally apprehended. Martin, 378 F.3d at 582. "Such a confrontation inherently presents the serious potential risk of physical injury because the fleeing driver[,] intent on his goal of eluding the officer[,] faces the decision of whether to dispel the officer's interference or yield to it." Id. at 583 (citation and quotation marks omitted). In this regard, fleeing and eluding resembles the offense of escape, id. at 582; Howze, 343 F.3d at 921-22, which several circuits (including this one) have agreed constitutes a "crime of violence" under the Guidelines, even where the escape involves merely walking away from a non-secure facility. United States v. Adewani, 467 F.3d 1340, 1341 (D.C. Cir. 2006); United States v. Turner, 285 F.3d 909, 916 (10th Cir. 2002); United States v. Jackson, 301 F.3d 59, 63 (2d Cir. 2002); United States v. Gay, 251 F.3d 950, 955 (11th Cir. 2001); United States v.

26

Nation, 243 F.3d 467, 472 (8th Cir. 2001); United States v. Harris, 165 F.3d 1062, 1068 (6th Cir. 1999).

Accordingly, we hold that felony fleeing and eluding, in violation of Fla. Stat. § 316.1935(3), is a "crime of violence" for purposes of the career-offender enhancement under U.S.S.G. § 4B1.2. As such, we conclude that the district court did not err in holding that Polynice qualified as a career offender under the Guidelines.

### 2. The Reasonableness of Polynice & Bernard's Sentence

Polynice and Bernard argue that their respective sentences of 420 months' imprisonment[7] are unreasonable in light of the factors set forth in 18 U.S.C. § 3553(a). We review the sentence imposed for reasonableness. United States v. Castro, 455 F.3d 1249, 1251 (11th Cir. 2006).

After correctly calculating the advisory Guidelines range, a "district court may impose a sentence that is either more severe or lenient than the sentence" this court would have imposed, "but that sentence must still be reasonable." United

---

[7] Polynice was sentenced to 240 months' imprisonment on Count 1, 360 months' imprisonment on Counts 2 and 3, and 180 months' imprisonment on Count 5, all to run concurrently. In addition, he received a consecutive 60-month sentence for Count 4.

Bernard was sentenced to 240 months' imprisonment for Count 1, 360 months' imprisonment for Counts 2 and 3, and 120 months' imprisonment for Count 5, all to run concurrently. He also received a consecutive sentence of 60 months' imprisonment for Count 4.

States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005).  This court's "[r]eview for reasonableness is deferential[,]" and "the party who challenges the sentence bears the burden of establishing that the sentence is unreasonable in the light of both [the] record and the factors in section 3553(a)."  Id.

Here, the district court correctly calculated the Guidelines range for Polynice and Bernard to be 420 months to life imprisonment.  After expressly considering the § 3553(a) factors, the district court found that 420 months' imprisonment (which was at the low end of the Guidelines range) was appropriate.  Nothing in the record demonstrates that 420 months was unreasonable.

## III.  Conclusion

For the foregoing reasons, we **REVERSE** Witherspoon's firearms convictions (Counts 4 and 5 of the indictment), **VACATE** his sentence, and **REMAND** for resentencing.  In all other respects, we **AFFIRM** the district court.