[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 9, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-10183
Non-Argument Calendar

_____

D. C. Docket No. 06-00112-CR-CAR-5

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CAREY GILBERT CHAPPELL,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(January 9, 2009)**

Before ANDERSON, HULL and MARCUS, Circuit Judges.

PER CURIAM:

After a jury trial, Carey Gilbert Chappell appeals his conviction for bank

robbery, in violation of 18 U.S.C. § 2113(a). After review, we affirm.

## I. BACKGROUND

Because Chappell challenges the sufficiency of the government's evidence that he was the bank robber, we review the evidence linking Chappell to the robbery.

On August 14, 2006, at 11:07 a.m., a SunTrust Bank on Gray Highway in Macon, Georgia was robbed. That morning, Wyvonia Gillespie, the bank's customer service representative, saw an African-American man run toward and enter the bank. The man had a white T-shirt or towel over his head and was screaming for help. The white covering was stained with a red substance that appeared to be blood.

Once inside the bank, the man staggered around and then tried to go through a locked teller door. When he was unsuccessful, the man's demeanor suddenly changed. He stated, "this is a robbery," jumped over a teller station, pointed pepper spray at the teller, Kecia Cooper, and said "[g]ive me the money." The man grabbed Cooper's teller drawer containing $7,980, jumped back over the counter and left the bank. Cooper described the robber as about 5'5" with a small build.

As the robber fled, a bank customer, Nathaniel Dunn, was walking up to the bank. Dunn saw a man wearing dark clothing and a white towel over his face run

2

out and go behind a nearby dumpster.  When Dunn approached the dumpster, the man said he would shoot Dunn if he did not get back, and Dunn retreated. Moments later, Dunn saw the man get on a bicycle and leave the area.

Police found the teller drawer in the grass near the dumpster.  Inside the dumpster was a small canister of pepper spray and a white T-shirt with orange stains, which later were determined to be ketchup.  Police also found a partial shoe track on the teller counter, probably from a tennis shoe.  The only identifiable print, a partial palmprint found inside the bank, did not match Chappell.  Of the money taken, only five $20 bills were "bait bills," meaning their serial numbers had been recorded.  Thus, of the $7,980 taken in the robbery, only $100 was in bait bills.

Photographs taken by the bank's security camera show a dark-skinned man in dark clothing with a white cloth covering his head and face.  Because of this cloth covering, none of the eyewitnesses saw the robber's face clearly enough to identify him.  Neither Gillespie nor Cooper was able to identify Chappell in a lineup, and Dunn was not asked to view a lineup.

Although none of the eyewitnesses could identify Chappell, the government presented a constellation of circumstantial evidence that Chappell was the bank robber.  For example, on the morning of the bank robbery, between 10:00 a.m. and

3

12:30 p.m., Michael Preston, Jr., bumped into Chappell (whom he knew as "Gee") at a Circle-K convenience store behind the SunTrust bank. Chappell was dressed in black and wearing "a white scarf thing" around his head. Chappell asked Preston if he wanted to make some money, and Preston responded he did not.

Around 11:30 that morning, Melando Hollings, who lived near the SunTrust bank, found a man on his porch. The man was wearing a dark shirt and was "scrunched down" on the floor of the porch looking out at the street. Hollings described the man as sweaty. When Hollings asked what the man was doing on his porch, the man asked Hollings for a ride to the Fort Hill area and told Hollings he had money. Hollings refused, went into his home and got his handgun. Hollings stood in the door and asked the man to leave. The man asked Hollings to "give [him] a minute and [he'll] go." The man then left.

Approximately twenty minutes after the robbery, Detective Robert Shockley was in Hollings's neighborhood behind the bank looking for the bank robbery suspect.[1] Shockley knocked on the door, and Hollings answered. Hollings gave Shockley a description of the man he found on his porch. Two days later, Hollings identified Chappell in a photo lineup. Hollings also identified Chappell at trial as

[1]Shockley was flagged down by an unidentified man who indicated he had seen a man run onto the porch of one of the houses and then run around the side of the house. Shockley investigated, but did not find anyone around the outside of the house.

the man on his porch.

Several people who knew Chappell testified that he: (1) never had much money; (2) did not have a job; (3) did not own a car; (4) was a small man; (5) was from the Fort Hill area of Macon; (6) rode a bicycle; and (7) always wore black clothing. When Chappell was arrested in a motel three days after the bank robbery, police found approximately $300 in new clothing, including two black shirts still in the shopping bag and a pair of sports shoes, and a blue Chevrolet Caprice. Chappell had only $18, however, and the serial numbers did not match the stolen bait bills.

Subsequent police investigation revealed that, on the afternoon of the bank robbery, Chappell purchased the Chevrolet from Hollis Hunt for $2,500 in cash. According to Hunt, Chappell approached him and asked to buy the Chevrolet. Chappell paid in twenty, fifty and hundred dollar bills and did not ask for a bill of sale. Two days later, the police interviewed Hunt about the sale. Hunt gave the police the $1,000 that was left of the money Chappell had paid him, but none of the serial numbers matched the bait bills from the robbery.

The government also called three witnesses who were housed at the Dooly County jail with Chappell, all of whom testified that Chappell confessed to the robbery. James Williams knew Chappell before they were incarcerated. Williams

testified that on June 5, 2006, Chappell offered to sell Williams some jewelry he said he had stolen from a jewelry store. Williams declined, and they parted ways.

On July 4, 2006 Williams saw Chappell again. Chappell was looking for money and told Williams that Hollis Hunt owed him money for the jewelry. Williams took Chappell to Hunt to get the money. However, after Chappell left Hunt, he told Williams he still needed money and asked Williams if he would "be down with hitting a bank with him." The next day, Williams, who was out on bond for unrelated drug offenses, had his bond revoked and was placed in the Dooly County jail ("Dooly").

While at Dooly, Williams encountered Chappell, who admitted to Williams he had robbed a bank and explained that the police did not have the right money as evidence in his trial because he had switched the bank robbery money with Hunt. Chappell told Williams that the government had "nothing on him" and he was "going to trial."

Corey Sheffield was housed next to Chappell for two weeks. During that time, Chappell told Sheffield that he: (1) had committed the bank robbery, but police did not have any evidence; (2) wrapped a towel around his head to hide his face during the robbery; (3) put ketchup on the towel to pretend someone had hit him; (4) obtained the teller drawer by threatening the teller with pepper spray; (5)

6

rode off on his bike after the robbery; (6) threw the fifty dollar bills away because they had dye on them; and (7) used some of the money to buy a car and new clothes and hid the rest.

Kenyon Gresham, who was Chappell's cellmate at Dooly, testified that Chappell said he: (1) had robbed a bank on Gray Highway; (2) was supposed to rob the bank with someone else, but the other person was "locked up" so he did the robbery by himself; (3) put a towel over his face so that the camera could not see him and jumped over the counter to grab the money; (4) had a bottle of mace with him during the robbery; (5) after the robbery, ran onto a porch, where someone gave him a brown shirt to wear, and, after police left the area, ran back to the Fort Hill area; (5) threw away some of the bills that could not be spent because they "wasn't no good"; and (6) used some money to buy a Caprice and let a girl keep the rest.

## II. DISCUSSION

### A. Sufficiency of the Evidence

To be convicted of bank robbery under § 2113(a), the government must prove beyond a reasonable doubt that the defendant, through use of intimidation or force and violence, took money that was in possession of a bank. See 18 U.S.C. § 2113(a). Chappell argues that the government failed to prove that he was the bank

robber, stressing the absence of physical evidence linking him to the crime.[2]

The government's evidence established that: (1) in the month leading up to the robbery, Chappell tried to recruit a friend to help him rob a bank; (2) Chappell was in the vicinity of the bank on the morning of the robbery wearing, like the bank robber, a white "scarf thing" on his head and asking a friend if he wanted to make some money; (3) Chappell remained in the bank's vicinity just after the robbery and was found sweating and crouched on the stranger's porch while watching the street–i.e., hiding; (4) Chappell offered the stranger money if he would transport him out of the neighborhood; (5) Chappell was known to wear black and ride a bicycle and the bank robber wore black and fled the scene on a bicycle; and (6) Chappell did not have a job, money or a car before the bank robbery, but suddenly, on the afternoon of the robbery, had $2,500 in cash to buy a car.

In addition, the government presented three witnesses, Williams, Sheffield and Gresham, who testified that Chappell confessed to them that he robbed a bank and gave them details that were consistent with the modus operandi of the

---

[2]We review <u>de novo</u> challenges to the sufficiency of the evidence, viewing the evidence in the light most favorable to the government and resolving "all reasonable inferences and credibility evaluations in favor of the jury's verdict." <u>United States v. Robertson</u>, 493 F.3d 1322, 1329 (11th Cir. 2007), <u>cert. denied</u>, 128 S. Ct. 1295 (2008). The evidence is sufficient if a reasonable factfinder could have found that it established the defendant's guilt beyond a reasonable doubt. <u>United States v. McDowell</u>, 250 F.3d 1354, 1364-65 (11th Cir. 2001).

SunTrust robber. From this evidence, a reasonable jury could conclude beyond a reasonable doubt that Chappell was the SunTrust bank robber.

Further, contrary to Chappell's contention, his conviction did not rest entirely on this "jailhouse confession" testimony, and the other evidence summarized above provides compelling circumstantial proof that Chappell was the SunTrust robber. The absence of fingerprint or other physical evidence does not render the jury's verdict unreasonable given the circumstantial evidence that Chappell was the SunTrust bank robber. See United States v. Calderon, 127 F.3d 1314, 1324 (11th Cir. 1997) (explaining that a jury verdict must stand "unless no trier of fact could have found guilt beyond a reasonable doubt" (quotation marks omitted)).

**B.     Sixth Amendment Confrontation Clause**

Chappell argues that the district court violated his Sixth Amendment confrontation rights by improperly limiting his cross-examination of Preston, who saw Chappell before the robbery, and Gresham, Chappell's cellmate. Subject to the Sixth Amendment's Confrontation Clause, the district court has wide latitude to limit cross-examination "'based on concerns about, among other things, confusion of the issues or interrogation that is repetitive or only marginally relevant.'" United States v. Arias-Izquierdo, 449 F.3d 1168, 1178 (11th Cir. 2006)

9

(quoting United States v. Baptista-Rodriguez, 17 F.3d 1354, 1370 (11th Cir. 1994)). "The Confrontation Clause is violated if a criminal defendant can demonstrate that he was prohibited from engaging in otherwise appropriate cross-examination designed to show bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness." United States v. Orisnord, 483 F.3d 1169, 1178 (11th Cir.), cert. denied, ___ U.S. ___, 128 S. Ct. 673 (2007) (quotation marks omitted). "The test for the Confrontation Clause is whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." Id. at 1179. The Sixth Amendment is satisfied if "sufficient information is elicited from the witness from which the jury can adequately assess possible motive or bias." Id.[3]

    1.    Gresham[4]

_____

[3]We review a district court's restrictions on cross-examination for abuse of discretion. Orisnord, 483 F.3d at 1178.

[4]On appeal, Chappell argues that the district court improperly limited his cross-examination of government witnesses who testified that Chappell confessed to the bank robbery while they were housed together in jail. Chappell does not identify those witnesses by name or analyze them individually. Of the three government witnesses that testified about a jailhouse confession (Gresham, Williams and Sheffield), Chappell asserted a Confrontation Clause argument in the district court only with regard to Gresham.

    Further, Chappell sought to introduce certified copies of Williams's and Sheffield's prior convictions and review those convictions on cross-examination, but the district court excluded this evidence and testimony as unduly cumulative because the convictions already had been

10

At the time of trial, Gresham had two pending state court drug charges. Chappell wanted to inquire into these pending charges on cross-examination "to question his interest and his motivations and his biases and his eagerness to testify favorably to the Government to receive favorable treatment" in the state court cases. Out of the presence of the jury, the district court allowed the parties to question Gresham, who testified that: (1) he had not received any promises regarding his pending state court charges; and (2) he did not think he would get any benefit with regard to those charges by testifying for the government in Chappell's case. The district court prohibited Chappell from asking about the pending state charges in front of the jury.

However, Gresham did testify about his federal charges and sentence. On direct examination before the jury, Gresham testified that he had pled guilty in March 2007 to federal drug charges and that he understood how a Rule 35 motion might reduce his federal sentence. On cross-examination, Chappell reviewed Gresham's two federal drug convictions and the mandatory minimum sentences he faced on those charges. Gresham also admitted that: (1) he had pled guilty; (2) he had received a 60-month sentence; (3) he did not want to serve a long prison

covered on direct examination. Chappell does not challenge these evidentiary rulings on appeal and does not identify any line of questioning as to Williams and Sheffield that he should have been allowed to pursue. Thus, with respect to these three witnesses, we review Chappell's Confrontation Clause claim only as to Gresham.

11

sentence; (4) he was trying to get the shortest sentence possible; (5) under the terms of his plea agreement, he could get his sentence reduced for providing substantial assistance in the prosecution of another person, but only if the government filed a motion; (6) he already had received one sentence reduction; and (7) <u>he hoped to get a further reduction for his testimony in Chappell's trial</u>.

Here, there was no showing that Gresham's pending state drug charges were relevant to the facts of Chappell's bank robbery case or that Gresham made a deal with the government with regard to his pending <u>state</u> charges. Indeed, Gresham testified that he did not expect to receive any favorable treatment as to his state charges for testifying in Chappell's federal trial. Thus, Gresham's pending state drug charges were only "marginally relevant." <u>See</u> <u>Francis v. Dugger</u>, 908 F.2d 696, 699, 702 (11th Cir. 1990) (concluding, on habeas review, that trial court did not violate Confrontation Clause in prohibiting defendant from asking government witness about pending unrelated murder charge because it was only "marginally relevant").[5] Furthermore, Chappell was permitted to explore on cross-examination Gresham's motives for testifying for the government, including his hope for a

_____

[5]Like the district court, we reject Chappell's argument that Gresham was a "star" or "key" witness for the government. The government's case against Chappell was made by piecing together circumstantial evidence using the testimony of numerous witnesses, of which Gresham was only one. As the district court noted, this trial had no star or key government witness.

12

reduced sentence on his federal drug charges upon a Rule 35 motion by the government. In other words, sufficient information was elicited from Gresham for the jury to adequately assess his possible bias. Under the circumstances, we cannot say the district court violated the Confrontation Clause or abused its discretion in prohibiting cross-examination as to Gresham's pending unrelated state charges.

2.    Preston

Preston gave a statement to law enforcement about seeing Chappell on the morning of the robbery and agreed to be a witness in Chappell's case on August 14, 2006. On March 20, 2007, Preston was placed on eight years' probation for a state felony theft by receiving offense.[6] In addition, on October 5, 2007, ten days prior to Chappell's trial, Preston was arrested and charged with a misdemeanor theft by receiving offense and probation violation. At the time of trial, Preston was out on bond on the pending state charge.

At trial, Chappell wanted to question Preston about his prior felony theft by receiving offense, his probationary status for that felony offense and his recent arrest on the state misdemeanor charge. During a proffer outside the jury's presence, Preston testified that the federal prosecutor had not promised him any

---

[6]However, because the theft offense was adjudicated under Georgia's first offender statute, it was not considered a "conviction." See O.C.G.A. § 42-8-60 (permitting court to defer proceedings, place first offender defendant on probation without a judgment of guilt and dismiss the charges once defendant completes the probationary term).

13

benefit for his testimony. The district court found that, because Preston agreed to testify and gave a statement before he was placed on state probation on March 20, 2007 or arrested on October 5, 2007, those events were too remote and irrelevant to show bias. The district court limited the cross-examination to whether Preston was on state probation, whether he had been charged with violating that probation and whether he hoped to benefit from his testimony. After the jury returned, Preston admitted on cross-examination that he currently was on state probation and faced a potential probation violation, but denied that he hoped to benefit favorably by testifying for the federal government in Chappell's trial.

We cannot say the district court abused its discretion in concluding that the possibility of bias on account of these state matters was remote. Chappell made no showing of a deal between Preston and either state or federal prosecutors, making these pending state charges only marginally relevant. See Francis, 908 F.2d at 702. Moreover, the district court allowed Chappell to question Preston about his current probationary status and the threat of a probation violation. Thus, Chappell was able to elicit sufficient information for the jury to adequately assess Preston's possible bias. The additional information Chappell wanted to elicit about Preston's theft-offense probation and his pending state charge for misdemeanor theft would not have given a reasonable jury a significantly different impression of Preston's

14

credibility. Therefore, the district court did not violate the Confrontation Clause or abuse its discretion in limiting Preston's cross-examination.

**C.      Rule 404(b) Evidence**

Chappell argues that the district court violated Federal Rule of Evidence 404(b) by permitting Williams to testify about Chappell's jewelry store robbery.

Under Rule 404(b), extrinsic evidence of prior bad acts may be admitted only for purposes other than proof of bad character. Fed. R. Evid. 404(b).[7] Evidence of criminal activity other than the offense charged is not subject to Rule 404(b) analysis, however, when the evidence is "(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense." United States v. Ellisor, 522 F.3d 1255, 1269 (11th Cir. 2008). Such evidence is admissible if it is "linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." United States v. Williford, 764 F.2d 1493, 1499 (11th Cir. 1985).

---

[7]Rule 404(b) states:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . .
Fed. R. Evid. 404(b).

Even if the evidence meets this test, it still may be excluded if the "probative value 'is substantially outweighed by the danger of unfair prejudice.'" United States v. Fortenberry, 971 F.2d 717, 721 (11th Cir. 1992) (quoting Fed. R. Evid. 403).[8]

Williams testified that, two months prior to the bank robbery, Chappell offered to sell him some jewelry he said he had stolen from a jewelry store. Williams declined and, a month later, Chappell told Williams that he needed to see Hunt to get money for the jewelry. After stopping to see Hunt, Chappell told Williams he still needed money and asked Williams if he would help rob a bank.

Chappell's attempt to recruit Williams to rob a bank was both relevant and probative of Chappell's identity as the SunTrust bank robber. Chappell's statement about the jewelry store robbery was necessary to explain the relationship between Chappell and Williams and gave context to Chappell's bank robbery request. Had the jewelry store robbery testimony been excluded, the jury would have been led to the mistaken belief that Chappell asked Williams out of the blue to rob a bank. The testimony about the jewelry store robbery established that Chappell felt comfortable talking with Williams about committing illegal acts. As such, Williams's recounting of Chappell's jewelry store robbery statement was inextricably intertwined with his testimony about Chappell's attempt to recruit him

---

[8]We review admission of prior bad acts evidence for abuse of discretion. Ellisor, 522 F.3d at 1267.

16

to commit a bank robbery. Given that this testimony was probative of identity–the key question in the case–we cannot say that its probative value was substantially outweighed by the danger of unfair prejudice. Accordingly, we find no abuse of discretion. For all the foregoing reasons, we affirm Chappell's bank robbery conviction.

**AFFIRMED.**