[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-14815
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 5, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-60290-CR-KAM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MADARROW SMITH,
WALTER ROBERTS,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(November 5, 2009)

Before BLACK, PRYOR and KRAVITCH, Circuit Judges.

PER CURIAM:

Madarrow Smith and Walter Roberts appeal their convictions for conspiracy to possess with intent to distribute five kilograms or more of cocaine. On appeal, they challenge the district court's denial of their requested jury instructions. After a thorough review of the record, concluding there was no error, we affirm.

I. Background

Smith and Roberts were indicted along with Caleb Glenn Williams, Anthony Butler, and Corey Edwards for conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846 (Count 1); attempted possession with intent to distribute five kilograms or more of cocaine, in violation of § 846 (Count 2); and using and carrying a firearm in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c) (Count 3). Tavoris Battle was charged by information with conspiracy under 18 U.S.C. § 1951 in connection with these offenses. Williams, Butler, Edwards, and Battle pleaded guilty; Smith and Roberts proceeded to trial.

According to the evidence presented at trial, after receiving information from a confidential informant ("CI") about a group of individuals committing armed robberies, Special Agent Michael Connors and the ATF initiated a sting operation in which Connors would go undercover and set up a fake robbery of a drug stash house. Upon Connors's request, the CI introduced him to Williams with

2

the cover story that Connors worked for a narcotics organization and needed a crew to rob a stash house. Connors then met with Williams to discuss the robbery. At that meeting, which was recorded, Connors explained that he drove a truck for a group of Colombians, usually transporting fifteen or twenty kilograms of cocaine to different vacant houses for pick-up. Because the Colombians had not been paying what they promised, Connors wanted to rob a stash house to get his money. He advised Williams that there were routinely two men guarding a house, each armed with handguns. Connors repeatedly stated the job was a "guaranteed thing." Connors suggested that he could get the crew a rental car if they needed it. Williams indicated that he would need four men to do the job and the men would want to meet Connors before the robbery.

Connors later met with Williams and Butler. After discussing details of the robbery, Connors told Butler it was important that the crew have experience to get the job done, and he stated that there would be a guaranteed twenty-five to thirty kilograms of cocaine in the house. Butler said he had three others on his crew, and he arranged a meeting between Connors and the rest of the crew.

Connors next met with Williams, Butler, Edwards, and Roberts. During this meeting, Roberts asked about the location of the robbery, the type of guns the men at the stash house would have, the number of people guarding the stash house, and

whether there was any other surveillance.  Roberts asked the best way to "take them."  Roberts stated that, when the crew entered the stash house, Connors would "get no special treatment.  Real robbers ain't got to beat nobody up, hit nobody. . . . A real robber come for the loot, man. . . . It's an art."  Roberts added that he "train[ed] for shit like this."  Roberts asked whether Connors had weapons or if the crew needed to get their own, which he indicated would not be a problem.  Roberts then told Connors to find a get-away car and suggested that Connors bring the guns to the meeting because the crew "can't be riding all the way out west, a car full of niggas with guns."  Roberts later asked whether there was any money in the stash house, to which Connors replied that there were only drugs.

Smith arrived at this meeting later.  He asked whether Connors was ever followed after leaving the stash house and he pointed out that the targets could not go to the police to report the robbery.  Smith asked about the weapons the guards carried and whether the guns were in the guards' hands or on a table.

On the night of the robbery, Connors met the crew at a gas station.  Although Battle had not been present for any of the previous meetings, he arrived with Williams and Roberts.  The crew was dressed alike in dark clothes, ski masks, and gloves.  When asked if he had his mask and was ready, Roberts said, "Yeah, ready to do it."  According to Connors, no one ever indicated an unwillingness to

4

participate. The crew followed Connors to the alleged stash house where Smith noticed a security camera on the building and suggested everyone go inside. Roberts remained in the car. Law enforcement officers made the arrests after the crew entered the building.

Following the arrests, Smith and Williams were placed in a patrol car and their conversation was recorded. Smith wondered where Connors was, referring to Connors as "this pussy ass cracker who just set us up?" Smith commented that they were facing federal time now, to which Williams responded, "We didn't do shit." Smith agreed, explaining that the police had not found a gun on him. He then stated, "Cracker caught us dead in here." Smith then told Williams, "My wife ain't want me to come on this shit." Smith then said to the officers, "Only thing we were doing – coming to bring my man . . . some artillary . . . . Coming to sell his ass artillary and g[]d dammit, before we can get the deal done, y'all come in."

Roberts and Battle were placed in another car, where their conversation also was taped. Roberts stated that he was just "looking out." He commented that he had told Williams they did not need the guns. Roberts then stated, "I should have just said f[] it, I don't want to go in there, but I didn't want to look like no chump." He added, "I didn't have no plans to be back in this shit this fast."

On cross-examination, Connors admitted that the ATF was looking for

5

people predisposed to commit armed robberies. Counsel for the defendants repeatedly asked whether Connors had encouraged the offense by suggesting weapons and violence, offering to get a rental car, and promising that the crime was a "guaranteed thing." Connors explained that someone who was not predisposed would not show up on the day of the robbery, would not bring a gun or mask, and would try to back out. Connors stated that he had no contact with Roberts or Smith outside the meetings; thus, if someone recruited them to join, it was someone other than a law enforcement agent.

ATF Agent Eric Bauer testified that he was part of the arrest team and found Smith hiding under a trailer. After Smith was arrested and secured, agents searched under the trailer and found a gun and ski mask. Detective Jason Hendrick with the Broward County Sheriff's Office testified that he found gloves in Smith's pocket. He then explained that, after the defendants were taken to the station, Smith and Butler were held in a conference room to be interviewed. When Smith saw Connors enter the station, Smith said to Butler, "I told you we should have shot him."[1] ATF agent Jim Rhoden testified that he found gloves in Roberts's pocket, a black cap on Roberts's head, and guns and a mask in the car in which Roberts was riding. Rhoden admitted, however, that agents did not find a gun on

---

[1] The court issued a limiting instruction to the jury that this testimony was to be considered only against Smith and not in connection to Roberts.

Roberts.

After the government rested its case in chief, the defense called a single witness to testify about the lack of fingerprints or DNA evidence on the firearms.

Roberts and Smith requested that the court instruct the jury on the defense theory of entrapment. Roberts also requested that the jury be instructed on withdrawal from the conspiracy. After hearing argument, the court denied both instructions.

The jury convicted Roberts and Smith of the conspiracy, but acquitted them of the remaining charges. The court sentenced each defendant to 324 months' imprisonment. This appeal followed.

II. Standard of Review

We review a trial court's refusal to give a jury instruction requested by the defense for abuse of discretion. United States v. Westry, 524 F.3d 1198, 1216 (11th Cir.), cert. denied, 129 S.Ct. 251 (2008), and 129 S.Ct. 902 (2009). To constitute reversible error, a defendant must show that the requested jury instruction "'(1) was a correct statement of the law; (2) was not adequately covered in the instructions given to the jury; (3) concerned an issue so substantive that its omission impaired the accused's ability to present a defense; and (4) dealt with an issue properly before the jury.'" Id. (quoting United States v. Brazel, 102 F.3d

1120, 1139 (11th Cir. 1997)).

III. Discussion

Smith and Roberts challenge the court's denial of their requested entrapment instruction on the ground that they offered evidence to show that the government agent induced them to commit the offenses, and thus the question of entrapment became a factual question for the jury. Roberts also challenges the denial of his requested withdrawal instruction.

A. Entrapment

Entrapment is an affirmative defense. United States v. Orisnord, 483 F.3d 1169, 1178 (11th Cir. 2007); United States v. Quinn, 123 F.3d 1415, 1423 (11th Cir. 1997). There are two elements to an entrapment claim: (1) government inducement of the crime and (2) the defendant's lack of predisposition to commit the crime before the inducement. Orisnord, 483 F.3d at 1178; United States v. Ryan, 289 F.3d 1339, 1343 (11th Cir. 2002). "[T]he defendant bears the initial burden of production as to government inducement[,]" and he may meet this "burden by producing any evidence sufficient to raise a jury issue that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready to commit it." Orisnord, 483 F.3d at 1178 (citation omitted). "The defendant may make such a showing by

8

demonstrating that he had not favorably received the government plan, and the government had to 'push it' on him or that several attempts at setting up an illicit deal had failed and on at least one occasion he had directly refused to participate." United States v. Andrews, 765 F.2d 1491, 1499 (11th Cir. 1985) (internal citations omitted). Once the defendant produces sufficient evidence of inducement, the government must prove beyond a reasonable doubt that the defendant was predisposed to commit the offense. Id.

Here, the district court did not abuse its discretion when it refused to instruct the jury on entrapment because neither Smith nor Roberts met the burden to show government inducement. According to the testimony at trial, Connors had no contact with either Smith or Roberts outside of the meetings and on the night of the robbery. The conversations at those meetings establish that Connors did nothing to induce the defendants; all he did was provide them with an opportunity. Thus, as the government notes, if anyone induced Smith or Roberts, it was someone other than a government agent.

Connors also testified that at no time did either Smith or Roberts appear unwilling to participate. The jury was free to judge the credibility of this testimony. United States v. Parrado, 911 F.2d 1567, 1571 (11th Cir. 1990).

Connors's statement that the robbery was a "guaranteed thing" does not

qualify as inducement. Nothing in this language shows that Connors had to "push" the plan on Smith or Roberts. Because Smith and Roberts failed to proffer sufficient evidence of government inducement, the issue of entrapment was not properly before the jury. Therefore, the district court did not abuse its discretion by refusing to instruct the jury on entrapment.

B. Withdrawal from the Conspiracy

Withdrawal is an affirmative defense that the defendant has the burden to prove. Westry, 524 F.3d at 1216. A defendant must prove "he undertook affirmative steps, inconsistent with the objects of the conspiracy, to disavow or to defeat the conspiratorial objectives, and either communicated those acts in a manner reasonably calculated to reach his co-conspirators or disclosed the illegal scheme to law enforcement authorities." Westry, 524 F.3d at 1216 (citations omitted). The defendant's burden to establish the defense is substantial; "mere cessation of activity in the conspiracy is not sufficient to establish withdrawal." Id. at 1217 (citations omitted).

Here, we conclude the district court properly denied the requested instruction as the issue was not properly before the jury on the evidence presented at trial. There was no evidence from which the jury could have concluded that Roberts took affirmative steps to defeat the conspiracy and that he tried to

communicate his withdrawal to the co-conspirators.

Roberts's claim that he withdrew by remaining in the car is insufficient to establish withdrawal. At most, his failure to enter the building shows cessation of activity, as he could have been acting as a lookout, and the fact that he remained behind did not communicate his withdrawal to the others involved. Therefore, because there was no evidence to establish that Roberts acted in a way inconsistent with the conspiracy's objectives or that he communicated his withdrawal to his co-conspirators, the issue of withdrawal was not properly before the jury.

IV. Conclusion

For the foregoing reasons, we conclude that the district court properly denied the requested jury instructions. Accordingly, we AFFIRM the convictions.

**AFFIRMED**.